Jerome KAPLAN, Plaintiff
Below-Appellant,

v.

Oscar S. WYATT, Jr., WJS Shipping Associates, Inc., a Delaware corporation,
and the Coastal Corporation, a Delaware corporation, Defendants Below,
Appellees.

Supreme Court of Delaware.

Submitted: June 27, 1985.

Decided: Oct. 9, 1985.

Melvyn Weiss (Argued), of Milberg, Weiss, Bershad, Specthrie & Lerach, New

York City, and Irving Morris and Kevin Gross of Morris and Rosenthal, Wilmington, for plaintiff below, appellant.

Henry N. Herndon, Jr. (Argued) and Richard D. Kirk of Morris, James, Hitchens & Williams, Wilmington, and James B. May and Roger J. Hawke of Brown, Wood, Ivey, Mitchell & Petty, New York City, for the Special Litigation Committee of The Coastal Corp.

A. Gilchrist Sparks of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant below, appellee WJS Shipping Associates, Inc.

Louis J. Finger of Richards, Layton & Finger, Wilmington, for defendant below, appellee Oscar S. Wyatt, Jr.

Roderick R. McKelvie of Ashby, McKelvie & Geddes, Wilmington, and Robert E. Walls, Houston, Texas, for defendant below, appellee The Coastal Corp.

Before McNEILLY and MOORE, Justices, and O'HARA, Judge.

McNEILLY, Justice.

Jerome Kaplan, a shareholder of the Coastal Corporation (Coastal), appeals from the Court of Chancery's decision in favor of Coastal's Special Litigation Committee motion to dismiss Kaplan's derivative suit. The primary issue on appeal is whether the Court of Chancery erred in its application of the guidelines for granting a corporation's request to dismiss a derivative suit as set forth in this Court's decision of *Zapata v. Maldonado*, Del.Supr., 430 A.2d 779 (1981). We conclude that the Court of Chancery correctly formulated and applied the guidelines of *Zapata*.

I

The factual circumstances which give rise to this appeal involve the alleged acts of impropriety of Oscar S. Wyatt, Jr. and the investigation conducted by Coastal's Special Litigation Committee (the Committee).

On February 4, 1981, Jerome Kaplan filed a derivative action on behalf of Coastal naming Coastal, Oscar S. Wyatt, Jr. and WJS Shipping, Inc. (WJS) as defendants. Coastal engages in the business of exploring, producing, and processing oil and gas and other resources. Oscar Wyatt is the founder of Coastal, its Chairman of the Board, and Chief Executive Officer.

Kaplan's amended complaint alleges that (1) Wyatt "interpositioned" himself in the "Rotterdam Spot Market" and thereby participated in and profited personally from oil trading activities which rightfully belonged to Coastal; (2) Wyatt wrongfully caused Coastal to enter on unfair terms into a sale and leaseback transaction for an oil tanker with WJS; and (3) Wyatt received excessive compensation from Coastal, including excessive amounts for the lease of his personal airplane to the corporation. Kaplan's amended complaint also contains general allegations of wrongful activity but does not identify any specific transactions which Wyatt may have participated in or profited from at the expense of the corporation.

In response to Kaplan's suit, Coastal's Board of Directors appointed two outside directors, Messrs. Raymond M. Holliday and J. Howard Marshall, II., to form the Committee. Holliday was an attorney and certified public accountant. Also, he was the Chairman of the Board of the Hughes Tool Company and served as an outside director for several other public corporations. Holliday was elected to Coastal's Board of Directors about a month after Kaplan filed his complaint. After the Committee filed its report and the motion on behalf of defendant Coastal to dismiss the suit, Holliday died.

Marshall is a member of Coastal's Board of Directors, and retired former executive of Allied Chemical Corporation, Ashland Oil and Refining Company, and Signal Oil and Gas Company. Marshall was approved as an independent director of Coastal as a result of a consent decree in an unrelated action by the Securities and Exchange Commission against Coastal. Prior to con-

senting to Marshall's election to the Board and appointment to the Committee, the SEC conducted an interview with him to examine his independence and his ability and willingness to represent the public interest since he is also a businessman. Also, several companies with which he is affiliated have done business with Coastal. For example, Marshall and members of his family are 16% owners of Koch Industries (Koch), a large, privately-held oil company. Coastal and Koch engage in the business of buying and selling oil. In 1983, the annual dollar volume of business between Coastal and Koch was $266 million, which amounts to less than 2% of Koch's sales. Also, Koch sold Coastal the oil tanker "Coastal Kansas".

Marshall is a 50% shareholder of the Petroleum Corporation (Petco). Petco engages in oil exploration. Subsidiaries of Coastal have participated in limited partnerships with Petco and have contributed large amounts of money to Petco's programs. Petco also owned a 38% interest in Independent Refining Corporation (IRC). Petco, however, sold its interest in IRC prior to the appointment of the Committee. Marshall's business connections are disclosed in relevant reports by Coastal and in its annual Proxy Statement.

To help Holliday and Marshall with their investigation, Special Litigation Committee retained the firm of Brown, Wood, Ivey, Mitchell and Petty (Brown, Wood) as the Committee's counsel and Ernst and Whitney as independent outside accountants. Neither firm had prior dealings with Coastal.

In the course of their investigation, the Litigation Committee interviewed 140 people throughout the world, including 49 employees and 25 people who had no connection with Coastal. Coastal's officers and in-house counsel gathered some of the documents used in the investigation and were present at some of the interviews. At each of these interviews attorneys from Brown, Wood were present and took handwritten notes. Following the interviews, the hand-written notes were transcribed into type-written memos, and then the handwritten notes were destroyed. Brown, Wood received in the vicinity of $500,000 for its efforts in fees and reimbursements.

One of the interviews conducted by the Committee was with Harry Durels, an oil trader. Prior to this interview, Mr. Durels had met with Melvyn Weiss, Kaplan's attorney, and Joseph Roeber in a London restaurant. Following the meeting, Roeber prepared a memo based on his impressions of the meeting (the Roeber Memo). The memo contains no evidence of Wyatt's wrongful actions alleged in the complaint.

Before interviewing Durels, the Committee requested a copy of the Roeber Memo from Weiss, but he did not respond to the request. Therefore, when the Committee interviewed Durels they did not question him on the Roeber Memo because at the time they did not know its contents. A copy of the Roeber Memo was finally made available to the Committee after Weiss received assurances he would not be sued for libel. After receiving the Roeber Memo the Committee forwarded a copy of it to Durels for his comment.

Also interviewed by the Committee were Julio, Roberto, and Jose Iglesias, who own almost all of the stock of the Mobile Bay Refining Company (Mobile Bay). Coastal and Mobile Bay engaged in oil transactions amounting to millions of dollars. The Iglesiases denied any knowledge of any wrongdoing by Wyatt in any transaction in which they were involved or about which they had knowledge.

In order to fully investigate the matters alleged in the complaint, the Committee repeatedly requested that Kaplan and Weiss provide the Committee with information on specific instances of wrongdoing. Kaplan did not respond to the requests because he did not trust the Committee.

The Committee conducted a thorough investigation of the two transactions named in the complaint. The first is the sale and leaseback agreement between Coastal and

WJS for the oil tanker "Coastal Kansas". Coastal purchased the "Coastal Kansas" from Koch in April, 1978. Because of his interest in Koch, Marshall abstained from the Board's consideration of the agreement. About a year later, the Coast Guard found that the tanker was not seaworthy. In March of 1980, Coastal entered into a sale and leaseback agreement with WJS. At that time, WJS was a partnership in which Wyatt's son Carl had a controlling interest. WJS purchased the tanker for $1 million plus repairs, which were originally anticipated to be $9 million and later rose to $10 million. According to the agreement, Coastal would lease back the tanker from WJS for $1,970,000 per year for ten years, but that figure was later reduced to $1,845,000 per year. However, the lease figure appearing in the annual reports is $2.7 million.

Wyatt avoided participation in the negotiation or any transaction relating to the "Coastal Kansas". The agreement was reviewed by all appropriate departments of Coastal and approved by the Executive Committee of the Board of Directors.

The Committee investigated the entire transaction and found that the negotiations had been at arms length, and that the agreement was reasonably fair to Coastal.

The other transaction thoroughly investigated by the Committee was the lease arrangement between Wyatt and Coastal for his personal Westwind aircraft. The Committee reviewed the lease and related documents, including accounting reports, maintenance records, and flight logs. Also, they interviewed Wyatt and Coastal employees from the Legal, Aviation, and Internal Audit Departments. They also received an independent analysis from the General Manager of the Westwind Division of Atlantic Aviation. The investigation revealed that ambiguities in the lease resulted in $60,000 in overpayments to Wyatt, and that a lack of care in the administration of the lease resulted in billing errors of $135,000. Wyatt promptly repaid these sums to Coastal. The Committee determined that the overpayments were not attributed to intentional wrongdoing, and that, overall, Coastal needed the aircraft and the lease was fair to the corporation.

The Committee investigation revealed that both the "Coastal Kansas" transaction and the lease of the Westwind aircraft were reasonably fair to Coastal, and that the allegations that Wyatt participated in improper trading and profited at the expense of Coastal could not be supported by fact. Thus, the Committee concluded that it would not be in the best interest of the corporation to proceed with the litigation and filed a motion to dismiss Kaplan's suit. Following the guidelines of *Zapata*, the Court of Chancery found that the Committee acted independently of the corporation, and that in good faith they conducted a reasonable investigation upon which to base their conclusions. Therefore, the Court of Chancery granted the motion to dismiss, and Kaplan now appeals that decision.

## II

In *Zapata v. Maldonado, supra,* this Court outlined the procedure to be followed by the Court of Chancery when a corporation's Special Litigation Committee requests the dismissal of a derivative suit. The Court of Chancery's opinion in this case provides an excellent, detailed analysis of the *Zapata* procedure which we accept as accurate and thus need not discuss it at length here. *See Kaplan v. Wyatt*, Del. Ch., 484 A.2d 501, 505–509 (1984).

In the first step of the *Zapata* analysis, the Court must examine the conduct and activities of the Special Litigation Committee to determine whether the Committee acted independent of the corporation, and in good faith conducted a reasonable investigation upon which it based its conclusions. If the Special Litigation Committee fails to meet any of these requirements, then the Motion to Dismiss must be denied. Kaplan contends that Coastal's Special Litigation Committee failed to satisfy all of these requirements. We disagree.

In our recent decision of *Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984), we stated that a director is independent when he is in a position to base his decision on the merits of the issue rather than being governed by extraneous considerations or influences. As we noted, it is the care, attention and sense of individual responsibility to the performance of one's duties that touch on independence.[1] *Id.* at 816. Kaplan challenges the Committee's independence because Marshall was a member of the Board of Directors at the time of the alleged transactions and he has investments and affiliations with companies that conduct substantial business with Coastal. Also, Kaplan alleges that Marshall cannot be independent because he is biased in favor of oil company executives. He also contends that the corporate officers' involvement in the investigation indicates that the Committee was not independent. Kaplan, however, fails to show how any of these factors were such an influence on Marshall or the Committee that they prevented them from basing their decisions on the corporate merits of the issues.

First, Marshall's presence on the Board does not establish a lack of independence on the part of the Committee. The mere fact that a director was on the Board at the time of the acts alleged in the complaint does not make that director interested or dependent so as to infringe on his ability to exercise his independent business judgment of whether to proceed with the litigation. *Id.* at 815. Even a director's approval of the transaction in question does not establish a lack of independence. *Id.* at 817. Kaplan needs to show more

than just Marshall's presence on the Board to establish a lack of independence. In this case, as a member of the Board Marshall abstained from voting on Koch's sale of the "Coastal Kansas" to Coastal, and nothing in the record indicates that Marshall's position as a member of the Board of Directors influenced his decisions as a member of the Committee.

Second, standing alone, Marshall's association with businesses that transact with Coastal does not establish that Marshall was not independent. There is no evidence of any personal dealings between Marshall and Wyatt or between Marshall and Coastal. Nor is there any evidence that Marshall's business affiliations influence his decisions relating to Coastal. Again, Kaplan fails to show how these connections impair Marshall's ability to make an independent decision.

Third, Kaplan contends that Marshall cannot be deemed independent because Marshall has expressed sympathy for oil company executives and a dislike for government interference in the oil industry. As a member of Coastal's Board of Directors, Marshall voted to indemnify Wyatt for expenses he incurred in connection with his guilty plea to a misdemeanor charge for violating regulations governing the production and sale of crude oil.[2] But Kaplan has failed to present any evidence showing that Marshall's decisions with the Committee were based upon his alleged bias. Allegations of natural bias not supported by tangible evidence of an interest on the part of the Committee in the outcome of the litigation do not demonstrate a lack of inde-

---

**1.** In *Aronson* we held that a stockholder's demand upon a Board of Directors can be excused as futile only where facts are alleged with particularity which create a reasonable doubt that the director's action was entitled to the protections of the business judgment rule. In addition, presence on the board at the time of the transaction is by itself insufficent to establish a lack of independence on the part of the director.

Kaplan contends that there is an important distinction between a motion to dismiss a suit made by a Special Litigation Committee and a determination by the Board of Directors after demand of whether it should bring the suit, because in the latter case if the board rejects the demand the shareholder can still bring the suit, while in the former case the suit is terminated. This distinction is irrelevant to the director's ability to make an independent business judgment.

**2.** The subject of those proceedings is unrelated to the allegations in Kaplan's complaint. Also, Wyatt's activities did not benefit Wyatt, rather they benefited Coastal.

pendence. Kaplan has failed to show here that Marshall based his conclusions in the Committee's report on any of these outside influences rather than the merits of the issues. We are satisfied that the Chancellor had the question before him, considered it and rejected the plaintiff's arguments. There was no abuse of discretion. Thus, Marshall and the Committee must be deemed to be independent.

■ Kaplan also challenges the independence of the Committee because Coastal's in-house counsel assisted in scheduling interviews, and the in-house counsel and some of Coastal's officers attended the interviews of Coastal's employees. Although such a practice is not recommended, it is not fatal to the Committee's investigation. Kaplan has failed to present evidence showing that the presence of the corporate officers influenced those being interviewed, altered the outcome of the investigation, or impaired the independence of the Committee in making its report. In sum, Kaplan has failed to show that any outside considerations influenced the conclusions reached by the Committee, therefore, the Committee must have acted independently of Coastal.

■ Kaplan also contends that the Committee did not investigate in good faith. Central to this allegation is the retention of Brown, Wood as the Committee's counsel. Brown, Wood and one of its former senior partners were defendants in multi-district litigation in which Kaplan's attorneys, Messrs. Morris and Weiss, were counsel for the plaintiffs. *In re U.S. Financial Securities Regulation*, MDL No. 161 (S.D.Cal.). Kaplan contends that Brown, Wood must be hostile towards him because the firm and the senior partner had to contribute to the $50 million settlement of the case.[3] According to Kaplan, Brown, Wood's hostility is evidenced by the destruction of the handwritten interview notes. Kaplan does not dispute, however, that such a procedure is routinely used by law enforcement

agencies and has been sanctioned by the courts. *United States v. Pacheco*, 5th Cir., 489 F.2d 554 (1974), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). We find that Kaplan's allegations of impropriety by Brown, Wood are without merit, especially when considering that Kaplan did not accuse Brown, Wood of being biased and acting in bad faith until 10 months after the completion of the investigation.

Kaplan's other allegations of bad faith are related to the thoroughness of the Committee's investigation. He contends that the Committee concealed material facts and failed to investigate all of the matters alleged in his complaint, and thus the Court should not grant the motion to dismiss based on the Committee's report. Kaplan's claims of an inadequate investigation include the allegations that the Committee (1) misrepresented the extent of their investigation of Mr. Durels in reference to the Roeber Memo; (2) failed to investigate the allegations implied from the Roeber Memo; (3) failed to investigate any transaction made by Mr. Wyatt in the oil market; (4) used erroneous data in connection with the conclusion reached on the "Coastal Kansas" transaction; (5) failed to examine the relationship between Wyatt and the other parties to the "Coastal Kansas" transaction; and (6) concealed the facts surrounding the Iglesiases' reliability as witnesses.

■ We find that Kaplan's allegations and innuendoes are insufficient to nullify the report submitted by the Committee. Kaplan is correct that the Committee's report gives the impression that the Committee personally interviewed Durels about the Roeber Memo when in fact all they received were his written comments on the memo. However, in both the personal interview with the Committee and in his written comments, Durels claims to have no knowledge of Wyatt's wrongdoing. Also,

---

**3.** A confidentiality order entered in the case prevents disclosure of the exact amount contrib-

uted by Brown, Wood and its former senior partner.

the Roeber Memo contains nothing of consequence relating to the specific allegations set forth in Kaplan's complaint, therefore, the Committee was not required to investigate it.

The allegation that the Committee failed to investigate any of Wyatt's oil transactions is without merit. Kaplan never provided the Committee with any information on any transaction which he felt the Committee should investigate. Kaplan, however, requested that Coastal provide him with documents and information on 8 shipments of oil. The Committee presumed that he wanted the information because it was linked to the allegations of wrongdoing in his complaint. The documents relating to these transactions were reviewed by in-house and independent auditors, the Committee, and Brown, Wood. They found no evidence of any wrongful act. In more than four years of litigation Kaplan has failed to identify any illegal oil trade.

As for the "Coastal Kansas" transaction, Kaplan claims that the Committee based its conclusion that the deal was fair to Coastal on the wrong lease figures. He claims they used the $1,845,000 per year figure when the annual reports indicate that the lease rate is $2.7 million per year. The Committee explains that the annual rental rate is not a fixed rate. It is a floating rate based on the actual cost of repairs and WJS's variable interest costs. The Committee admits that because of the floating rate, the price of leasing the "Coastal Kansas" did rise, but still the transaction remained fair to Coastal.

Kaplan also contends that the deal could not have been fair to Coastal because there were close family and business relationships among the parties involved in the deal.[4] The Committee investigation revealed that Wyatt excused himself from participating in the negotiations, and that the transaction was fair to Coastal. In

light of these findings it was unnecessary for the Committee to examine more fully the relationships between the parties to this transaction.

As for the Iglesias interviews, Kaplan contends that the Committee did not include the fact that Julio and Roberto Iglesias asserted the Fifth Amendment privilege against self incrimination at a Congressional Subcommittee hearing. He claims that based on this fact the Iglesiases' information is unreliable. However, the hearing was unrelated to any of the allegations set forth in Kaplan's complaint, and, therefore, it was unnecessary for the Committee to include information on the subject in its report.

■ The Committee examined all of the allegations set forth in Kaplan's complaint and submitted a detailed report which was over 150 pages in length. The information in that report supports the conclusion that proceeding with the litigation would not be in the best interest of Coastal. The thoroughness of the Committee report, which closely examines the fairness of the transactions to Coastal, cannot be defeated by Kaplan's contentions that the Committee failed to examine matters not central to the allegations in his complaint.

Therefore, we conclude that the Court of Chancery correctly determined that the Committee acted independent of Coastal and other influences, and in good faith conducted a reasonable investigation upon which it based its conclusions. Thus, under the guidelines of *Zapata*, it was proper to grant the Motion to Dismiss Kaplan's suit.

### III

■ Kaplan contends that even if the Court of Chancery found that Coastal's Committee satisfied the first step of *Zapata*, the Court erred in not proceeding to the discretionary second step of the analysis. This step "is intended to thwart instances

4. After Coastal approved the agreement, WJS incorporated in Delaware with Carl Wyatt as its president. Phoenix Petroleum acquired 86% of WJS stock. Mr. Tracy DuBose, a former director and executive officer of Coastal and longtime friend of Wyatt, is the sole owner of Phoenix. At one time Wyatt guaranteed a $5 million loan for DuBose.

where corporate actions meet the criterion of step one, but the result does not appear to satisfy its spirit, or where the corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest." 430 A.2d at 789. Kaplan contends that his suit is one that this step is meant to preserve.

■■■ Proceeding to the second step of the *Zapata* analysis is wholly within the discretion of the court, and the Court of Chancery did not abuse its discretion when it declined to proceed to this step. Dismissing Kaplan's suit does not disturb the spirit of *Zapata*. The Committee's report supports the finding that further litigation would not be in the best interest of Coastal. The corporation's resources would be misspent in litigation based on the allegations in Kaplan's complaint. Therefore, the Court of Chancery properly applied the *Zapata* guidelines, and its decision to dismiss the suit was correct.

### IV

■■■ Kaplan's final contention is that the Court of Chancery improperly restricted discovery concerning the Committee and its investigation. This claim is totally without merit. In the *Zapata* context, discovery *may be ordered* to facilitate inquiries into independence, good faith, and the reasonableness of the investigation. This discovery is not by right, but by order of the Court, with the type and extent of discovery left totally to the discretion of the Court. The Court of Chancery did not abuse its discretion in permitting discovery on certain issues regarding the independence of the members of Coastal's Committee. Kaplan was not entitled to discover all the information relating to the Committee's report, and the Court of Chancery provided Kaplan with sufficient means to discover and examine the independence and good faith of the Committee's investigation.

In conclusion, the Court of Chancery correctly applied the guidelines of *Zapata*, and we hereby AFFIRM.