OPINION OF THE COURT
Shirley Werner Kornreich, J.
Motion sequence Nos. 001 and 002 are consolidated for disposition.
Security Police and Fire Professionals of America Retirement Fund and Arthur Murphy, Jr. are the lead plaintiffs in this derivative action brought on behalf of Morgan Stanley, a Delaware corporation, against individual, current and former Morgan Stanley directors and executive officers (collectively defendants) and, nominally, Morgan Stanley. The action concerns the compensation that Morgan Stanley paid and planned to pay to its employees for the years 2006, 2007, and 2009. Plaintiffs assert a claim for unjust enrichment against the executive officer defendants and claims for waste and breach of the duty of loyalty against both the executive officer and the director defendants. The director defendants move to dismiss plaintiffs’ claims for failure to make a pre-suit demand on Morgan Stanley’s board of directors (the Board). (Motion sequence No. 001.) The executive officer defendants move to dismiss plaintiffs’ claims on their merits. (Motion sequence No. 002.) Plaintiffs oppose both motions.
I. Background
Plaintiffs are shareholders of Morgan Stanley. Morgan Stanley is a publicly traded corporation with global operations in the financial services industry. It provides investment banking, *665 wealth management, and asset management services to a variety of investors. The company employs over 60,000 employees in over 600 offices, located in 36 countries.
The Board consists of 14 members. Directors John J. Mack and James E Gorman are also employees of Morgan Stanley. Mack, who is the chairman of the Board, served as the company’s chief executive officer (CEO) from June 2005 to December 2009. Gorman became CEO in January 2010, but he has worked for Morgan Stanley in various executive roles since February 2006. The other current members of the Board are defendants Roy J. Bostock, Erskine B. Bowles, Sir Howard J. Davies, James H. Hance, Jr., Nobuyuki Hirano, C. Robert Kidder, Donald T. Nicolaisen, Charles H. Noski, Hutham S. Olayan, Charles E. Phillips, Jr., O. Griffith Sexton, and Dr. Laura Tyson.
Plaintiffs allege in their complaint that Morgan Stanley’s directors: (1) approved excessive employee compensation for 2006, 2007, and 2009; (2) failed to continually assess the company’s compensation scheme in 2006, 2007, and 2009; and (3) failed to recoup the compensation paid to employees in 2006. (Complaint 1Í1Í 119-121, 124-128, 131-134.) Plaintiffs bring this lawsuit to recover, on behalf of Morgan Stanley, the excessive compensation paid during these three years.
Plaintiffs admit that they brought the lawsuit without first making a demand on the Board. They argue, however, that demand would have been futile because a majority of the Board members are either “interested” in the challenged transactions, or cannot independently assess the merits of the lawsuit. According to plaintiffs, Mack and Gorman are interested because they were employees of Morgan Stanley at all relevant times and received a financial benefit from the challenged transactions.
Plaintiffs claim that the nonemployee directors are interested because they face a substantial likelihood of liability for the challenged transactions. More specifically, plaintiffs allege that the nonemployee directors breached their fiduciary duties to the company when they approved compensation without regard to Morgan Stanley’s financial performance or the actual contributions of its employees. (Complaint 1ÍH 80, 82-89.) According to plaintiffs, the $14 billion total compensation approved for 2006 was excessive because it ignored the quality and source of the company’s revenues and net income, which were inflated by “risky, leverage trading activity.” Further, plaintiffs claim that in 2006, when Morgan Stanley’s revenues and profits were at *666 their peak, directors acted in bad faith by conferring the rewards of the high-risk trades to the company’s employees rather than to its shareholders.
Additionally, plaintiffs allege that the $16.6 billion total compensation paid in 2007 was excessive because it exceeded the compensation paid in 2006 ($14 billion), despite a decrease in company profits (from $9.10 billion to $2.44 billion) and net revenues (from $33.86 billion to $28.03 billion). The complaint provides specific compensation data about the two executives that stayed with the company after 2006, Mack and Scully. Mack’s compensation decreased from $41,411,283 in 2006 to $1,602,458 in 2007, and Scully’s compensation decreased from $20,093,087 to $15,211,212 for the same period. (Complaint 1Í1T 80, 82.) The complaint lists compensation of five executives in 2006, totaling $146,739,262, and compensation of six executives in 2007, totaling $70,671,164. The complaint contains no specific allegations concerning the compensation of nonexecutive employees.
Plaintiffs allege that the $14.4 billion total compensation approved for 2009 was excessive in light of a further decrease in net revenues and a year-end loss of $907 million. The complaint states that compared to 2007, the revenues decreased in 2009 from $28 billion to $23.4 billion, total compensation decreased from $16.6 billion to $14.4 billion, and the compensation/ revenue ratio increased to a “record” 62%. (Complaint 1i1i 82, 83.) According to the complaint, the New York Times reported that “[d] espite the first annual loss in its 74-year history, Morgan Stanley earmarked 62 cents of every dollar of revenue for compensation, an astonishing figure, even by the gilded standards of Wall Street.” (Complaint If 84.) Other media outlets echoed this sentiment. The complaint, however, does not allege specific facts that Morgan Stanley’s total compensation for 2009 was approved by the Board, and plaintiffs’ counsel admitted on the record that the Board did not approve compensation for every employee of Morgan Stanley. Plaintiffs insist, however, that the Board approved the total compensation paid in the form of bonuses and that this amount increased despite a decrease in revenues and profits.
The complaint alleges that the compensation for 2006, 2007, and 2009 also was excessive relative to the contributions that Morgan Stanley’s employees made to the company. Plaintiffs do not claim that Morgan Stanley received no consideration from its employees in return for the compensation it paid them, but, *667 rather, that the consideration received was “disproportionately small.” Plaintiffs contend the consideration received was disproportionately small because Morgan Stanley’s employees caused substantial damage to shareholder capital and the company’s overall financial health. As evidence, plaintiffs offer the steady decline in the price of Morgan Stanley’s stock (from $81 at the start of 2007 to $29.60 at the end of 2009), as well as the decline in revenues and profits. Plaintiffs claim that the company’s poor performance was tied to employee contributions because the company’s subprime mortgage-related investments forced the company to record $9.4 billion of write-downs in 2007. In addition, plaintiffs allege that Morgan Stanley’s investments would have caused the company to collapse but for a $10 billion TARP loan by the federal government and capital injections by private parties which further diluted existing shareholders’ investment.
Regarding the Board’s independence, plaintiffs claim that Morgan Stanley’s directors cannot exercise independent “business judgment” regarding the merits of this action since they are “beholden to Morgan Stanley and its executives.” (Complaint 1i1f 108-109.) As evidence, plaintiffs first offer the annual stipends that the company paid to its directors for their services as Board members, which varied from $325,000 to $376,733. The complaint contains no allegations regarding what was commonly understood and accepted to be a usual and customary director’s fee.
The complaint further challenges the independence of individual directors. According to the complaint, Olayan is a senior director and executive of The Olayan Group, which, allegedly, conducts significant business with Morgan Stanley. Plaintiffs claim that Morgan Stanley and The Olayan Group, among others, are owners of Bracor, a real estate investment company that recently invested $500 million in a business center in Sao Paulo. The complaint contains no allegations regarding The Olayan Group’s ownership interest in Bracor or its significance relative to the company’s other holdings.
According to the complaint, Phillips lacks independence because he is a director of Oracle and owns in excess of three million shares of that company. Plaintiffs claim that Morgan Stanley’s analysts cover Oracle and their recommendations can have a significant impact on its stock price. Thus, plaintiffs allege Morgan Stanley can indirectly affect the economic value of Phillips’ interest in Oracle. The complaint provides no specifics *668 about the significance of Phillips’ equity interest in Oracle relative to his total holdings.
Plaintiffs challenge Noski’s independence based on his prior partnership with Deloitte & Touche, which, allegedly, earns significant fees from Morgan Stanley. According to plaintiffs, Noski lacks independence because he is beholden to Morgan Stanley for the past financial benefits to Deloitte & Touche and because Noski is unlikely to take action to hurt his former company. Plaintiffs also challenge Sexton’s independence based on prior business relationships, alleging that Sexton was a banker at Morgan Stanley from 1973 to 1995.
Finally, plaintiffs challenge Bostock’s independence on the ground that his son-in-law is the co-CEO of FrontPoint Partners LLC (FrontPoint), a subsidiary of Morgan Stanley, which, according to plaintiffs, stands to be affected by this lawsuit. Plaintiffs also claim that Morgan Stanley’s executives can deprive Bostock’s son-in-law of significant compensation.
II. Discussion
A. Demand Futility
The director defendants move to dismiss this action on the ground that plaintiffs failed to make a demand on Morgan Stanley’s board of directors before bringing it. Plaintiffs claim that the demand would have been futile and is, therefore, excused. “One of the abiding principles of the law of corporations is that the issue of corporate governance, including the threshold demand issue, is governed by the law of the State in which the corporation is chartered.” (Hart v General Motors Corp., 129 AD2d 179, 182 [1st Dept 1987].) Morgan Stanley is incorporated in Delaware and, thus, Delaware law applies to the claimed futility of a demand here.
Under Delaware law,
“[i]n a derivative action brought by one or more shareholders . . . the complaint shall . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiffs failure to obtain the action or for not making the effort.” (Rules of Del Ch Ct rule 23.1 [a] [emphasis supplied].)
A derivative action allows a shareholder “to step into the corporation’s shoes and to seek in its right the restitution he could not demand in his own.” (Cohen v Beneficial Industrial *669 Loan Corp., 337 US 541, 548 [1949].) “The requirement of presuit demand in Chancery Court Rule 23.1 recognizes that the decision to pursue claims belonging to the corporation falls within the scope of the directors’ power to manage the business and affairs of the corporation.” (Kaplan v Peat, Marwick, Mitchell & Co., 540 A2d 726, 731 [Del 1988]; see also Starrels v First Natl. Bank of Chicago, 870 F2d 1168, 1173 [7th Cir 1989] [“demand requirement . . . allows directors to make a business decision about a business question: whether to invest the time and resources of the corporation in litigation”].) The demand requirement also assures “that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation” (Kaplan at 730), recognizing that “the final substantive judgment whether a particular lawsuit should be maintained requires a balance of many factors — ethical, commercial, promotional, public relations, employee relations, fiscal as well as legal” (Zapata Corp. v Maldonado, 430 A2d 779, 788 [Del 1981]). More pointedly, the corporation, through its board of directors, may choose not to pursue even a meritorious action because a “lawsuit that seems to have good prospects and a positive value . . . still may be an unwise business decision.” {Starrels at 1174 [emphasis supplied].)
Failure to make a demand is excused, however, when the demand would be futile. (Aronson v Lewis, 473 A2d 805, 807 [Del 1984], overruled on other grounds by Brehm v Eisner, 746 A2d 244 [Del 2000] [Brehm 1].) Demand is not futile merely because the directors take a hostile position to the derivative action, or because the court predicts that they will. (Kaplan at 732.) In fact, the test for demand futility presupposes this posture of hostility. (Id.) Rather, demand is futile “where officers and directors are under an influence which sterilizes their discretion, [and they] cannot be considered proper persons to conduct litigation on behalf of the corporation.” (Aronson at 814; see also Sohland v Baker, 15 Del Ch 431, 441, 141 A 277, 281-282 [1927] [demand futile where directors “whether by reason of hostile interest, or guilty participation in the wrongs complained of, cannot be expected to institute a corporate suit, or . . . would not be the proper persons to conduct the litigation incident thereto”].)
The specific test for demand futility depends on whether the shareholders challenge an affirmative decision or a failure to act on the part of the board. (See Aronson at 814 [affirmative decision]; Rales v Blasband, 634 A2d 927, 934 [Del 1993] [failure to act].) Where the complaint challenges a board’s affirmative de *670 cisión, the trial court, using “its discretion,” must determine whether the complaint alleges “particularized facts” which create a “reasonable doubt” that “(1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.” CAronson at 814.) “The prongs of the Aronson test are in the disjunctive; therefore, if plaintiff creates a reasonable doubt as to either prong of the test, demand is excused.” (Kahn v Portnoy, 2008 WL 5197164, *9, 2008 Del Ch LEXIS 184, *35 [Dec. 11, 2008]; see also Levine v Smith, 591 A2d 194 [Del 1991], overruled on other grounds by Brehm 1.) By contrast, where the complaint challenges a board’s failure to act, demand is futile if the court determines that “the particularized factual allegations” of the complaint “create a reasonable doubt” that the board is independent or disinterested in responding to the demand. {Rales at 934.)
Reasonable doubt must be raised as to a majority of the board of directors sitting at the time the complaint is filed. (See In re National Auto Credit, Inc. Shareholders Litig., 2003 WL 139768, *8-9, 2003 Del Ch LEXIS 5, *29-30.) The pleading burden for demand futility “is ‘more onerous’ than the burden a plaintiff must satisfy when confronted with a motion to dismiss.” (Khanna v McMinn, 2006 WL 1388744, *11, 2006 Del Ch LEXIS 86, *40 [May 9, 2006], citing Levine at 207; see also Brehm 1 at 254 [“(demand futility) pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings”].) Even though “[plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, . . . conclusory allegations are not considered as expressly pleaded facts or factual inferences.” {Brehm 1 at 255.) These additional restrictions are
“designed to create a balanced environment which will: (1) on the one hand, deter costly, baseless suits by creating a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms', and (2) on the other hand, permit suit by a stockholder who is able to articulate particularized facts showing that there is a reasonable doubt either that (a) a majority of the board is independent for purposes of responding to the demand, or (b) the underlying transaction is protected by the business judgment rule.” (Grimes v Donald, 673 A2d 1207, 1217 [Del *671 1996], overruled on other grounds by Brehm 1 [emphasis supplied].)
In this case, the challenge to the compensation paid to employees during 2006, 2007, and 2009 involves an affirmative decision and, thus, calls for an analysis of the demand requirement under the Aronson test. The second and third challenges— failing to continually assess the company’s compensation scheme in 2006, 2007, and 2009, and failing to recoup the compensation paid to employees in 2006 — by contrast, involve failures to act and should be analyzed under the Rales test. The directors’ disinterestedness and independence, however, are elements of both tests, and, therefore, material to the analysis of the demand requirement for all three challenges. The court will consider these issues first.
1. Disinterestedness
“Directorial interest exists whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders.” (Pogostin v Rice, 480 A2d 619, 624 [Del 1984] [Pogostin 1], overruled on other grounds by Brehm 1.) “In order to satisfy Aronson’s first prong involving director disinterest . . . plaintiffs must plead particularized facts demonstrating either a financial interest or entrenchment.” (Grobow v Perot, 539 A2d 180, 188 [Del 1988].) A claim of entrenchment, in turn, “requires an allegation that the challenged transaction posed an actual threat to the directors’ positions on the Board.” (Bodkin v Mercantile Stores Co., 1996 WL 652763, *3, 1996 Del Ch LEXIS 153, *11 [Nov. 1, 1996].) “Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.” (Rales at 936.) “[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors.” (Aronson at 815.) Rather, the court must be able to “conclude from the face of the complaint that this is a rare case where the circumstances are so egregious that there is a substantial likelihood of liability.” (In re Baxter Intl., Inc. Shareholders Litig., 654 A2d 1268, 1271 [Del Ch 1995] [emphasis supplied], citing Aronson at 815.)
The Board, here, has 14 members. Two of them, defendants Mack and Gorman, were employees of Morgan Stanley at all relevant times. As employees, they received a “personal benefit” from at least one of the transactions challenged in this ac *672 tion: the approval of employee compensation for 2006, 2007, and 2009. This benefit is “not equally shared” by the shareholders. Consequently, Mack and Gorman are interested directors for the purpose of at least one challenged transaction. (See Pogostin 1 at 624.)
Plaintiffs’ allegations, however, are insufficient to raise a reasonable doubt as to the disinterestedness of the remaining, non-employee directors. Plaintiffs argue that the nonemployee directors are interested because if they pursued the derivative claims asserted in this action, they themselves would face a substantial likelihood of liability for breach of duty of loyalty based on the waste of corporate assets, and/or acting in bad faith. Acting in bad faith and wasting corporate assets constitute breaches of the duty of loyalty. (See In re Citigroup Inc. Shareholder Derivative Litig., 964 A2d 106, 122-123 [Del Ch 2009] [bad faith]; Criden v Steinberg, 2000 WL 354390, *3, 2000 Del Ch LEXIS 50, *9 [Mar. 23, 2000] [waste].) Plaintiffs correctly state, and defendants admit, that if the nonemployee directors breached their duty of loyalty, the exculpatory provision contained in Morgan Stanley’s restated certificate of incorporation would not protect them from personal liability. (See Del Code Ann, tit 8, § 102 [b] [7] [“A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders . . . shall not eliminate or limit the liability of a director: (i) For any breach of the director’s duty of loyalty to the corporation or its stockholders”].) Therefore, the disinterestedness question requires the court “to adjudicate the merits on the pleadings” by inquiring into the likelihood that nonemployee defendants would be held liable for breach of duty of loyalty based on allegations of waste and/or acting in bad faith. (See Starrels at 1175.)
The complaint fails to raise “reasonable doubts” that a substantial likelihood of liability exists under any of the two claims. Both claims ultimately rest on a “conclusory” allegation that the compensation paid by Morgan Stanley to its employees for the years 2006, 2007, and 2009 was excessive. The complaint is ambiguous as to whether the target of plaintiffs’ challenge is total employee compensation or that of certain executives, but the challenge fails with respect to both. (See complaint 1111 80-99.)
To show breach of duty of loyalty based on bad faith, plaintiffs claim that the nonemployee directors acted in “intentional dereliction of duty” when they approved compensation without *673 regard to Morgan Stanley’s financial performance or the actual contributions of its employees. “[Liability . . . based on the concept of good faith . . . [is] embedded in the fiduciary duty of loyalty and [does] not constitute a freestanding fiduciary duty that could independently give rise to liability.” (Citigroup at 122-123.) “[T]he concept of intentional dereliction of duty, a conscious disregard for one’s responsibilities, is an appropriate . . . standard for determining whether fiduciaries have acted in good faith.” (Brehm v Eisner, 906 A2d 27, 62 [Del 2006] [Brehm 2].) “[Compensation levels are generally held to be within the discretion of the board of directors and the setting of compensation is presumed to have been in good faith.” (Pogostin v Rice, 1983 WL 17985, *4, 1983 Del Ch LEXIS 437, *12 [Aug. 12, 1983] [.Pogostin 2].) To show bad faith, “it is incumbent upon the plaintiffs to plead particularized facts that create a reasonable doubt that the board’s decisionmaking process was grossly negligent.” (Akins v Cobb, 2001 WL 1360038, *9, 2001 Del Ch LEXIS 135, *29 [Nov. 1, 2001].) “[A] court in reviewing a particular compensation may consider . . . ‘whether the salary bears a reasonable relation to the success of the corporation.’ ” (Kovacs v NVF Co., 1987 WL 758585, *4, 1987 Del Ch LEXIS 486, *10 [Sept. 16, 1987] [emphasis supplied], quoting Wilderman v Wilderman, 315 A2d 610, 615 [Del Ch 1974].)
Plaintiffs’ allegation that employee compensation was excessive in light of the company’s performance is conclusory for each of the relevant years. According to plaintiffs, the $14 billion total compensation approved for 2006 was excessive because it ignored the quality and source of the company’s revenues and net income, which were allegedly inflated by “risky, leverage trading activity.” “[T]he mere fact that a company takes on business risk and suffers losses — even catastrophic losses — does not evidence misconduct, and without more, is not a basis for personal director liability.” (Citigroup at 130.) Further, even if the revenues and income were inflated by risky investments, as plaintiffs allege, there is no evidence suggesting that the total compensation paid failed to reflect the underlying risk. The fact that total compensation represented 43% of net revenues is, without more, insufficient to raise a reasonable doubt that the total compensation was excessive in light of the company’s performance.
Plaintiffs argue that the $16.6 billion total compensation paid in 2007 was excessive because it was more than the compensation paid in 2006 ($14 billion), despite a decrease in the *674 company’s profits and net revenues. The complaint, however, provides “particularized facts” only about the compensation of certain executives in 2007. These facts, in turn, show that the 2007 executive compensation decreased following the decrease in revenues and profits. More specifically, the two executives that stayed with the company after 2006, Mack and Scully, received substantially lower compensation in 2007 compared to the compensation they received in 2006: Mack’s compensation decreased from $41,411,283 in 2006 to $1,602,458 in 2007 (96%), and Scully’s compensation decreased from $20,093,087 to $15,211,212 for the same period (24%). Further, the six executives listed by the complaint in the executive compensation table for 2007 received less than half the compensation received by the five executives listed in the executive compensation table for 2006. This reinforces the conclusion that executive compensation decreased with the decrease in company performance. In sum, the only particularized facts alleged in the complaint with regard to the 2007 compensation support the conclusion that executive compensation bore a “reasonable relation” to company performance — when company performance suffered, executive compensation fell. (See Kovacs, 1987 WL 758585, *4, 1987 Del Ch LEXIS 486, *10.) Therefore, if the 2007 compensation was excessive, it was due to payment of nonexecutive compensation. The complaint, however, fails to provide “particularized facts” about nonexecutive compensation in 2007, and, thus fails to raise a reasonable doubt that nonexecutive compensation was excessive.
Similarly, plaintiffs’ allegation that total compensation for 2007 was excessive, fails to raise a reasonable doubt that directors face a substantial likelihood of liability. First, there is no specific evidence that Morgan Stanley’s total compensation was approved by the Board. In fact, plaintiffs’ counsel admitted on the record that directors did not approve compensation for every employee of Morgan Stanley. Nonetheless, plaintiffs insist that the Board approved the total compensation paid in the form of bonuses and that this amount increased despite a decrease in revenues and profits. This allegation, in turn, remains unsupported. Plaintiffs’ “particularized facts” show that total compensation increased in 2007 despite a decrease in revenues and profits. It does not follow from these facts that the amount paid as bonuses increased as well. Several, equiprobable explanations exist for the increase in total compensation, the most salient of which include an increase in the total number of *675 employees, an increase in nonbonus compensation, and an increase in the price of labor. Plaintiffs offer no particularized facts to support their allegation that the increase in total compensation resulted from a bonus increase. Their allegation, therefore, remains conclusory and, as such, cannot raise a reasonable doubt that the directors face a substantial likelihood of liability for approving the 2007 compensation. (See Brehm 1 at 255.)
Plaintiffs’ claim that the 2007 compensation was “unconscionably high” is also conclusory, and, again, does not directly implicate the directors. As discussed in connection with the 2006 compensation, the total compensation/revenue ratio, without more, is irrelevant. In short, the “particularized facts” alleged with respect to Morgan Stanley’s 2007 compensation either fail to support the conclusion that compensation and performance were not “reasonably related” or support the contrary conclusion that they were. (See Akins, 2001 WL 1360038, *9, 2001 Del Ch LEXIS 135, *29; Kovacs, 1987 WL 758585, *4, 1987 Del Ch LEXIS 486, *10.)
Equally conclusory is plaintiffs’ allegation that the 2009 compensation was excessive in light of the company’s performance. The complaint states that, compared to 2007, the revenues decreased in 2009 (from $28 billion to $23.4 billion), but total compensation also decreased (from $16.6 billion to $14.4 billion). Expressed in percentages, compensation decreased by approximately 13% when revenues decreased by approximately 17%, suggesting, again, that compensation was adjusted downward to reflect company performance. Clearly, the percentage decrease in compensation did not perfectly mirror the percentage decrease in revenues. There is, however, no evidence to suggest that the mismatch exceeded the Board’s ordinary discretion to set compensation levels in light of business considerations such as employee retention and morale. (See Pogostin 2, 1983 WL 17985, *4, 1983 Del Ch LEXIS 437, *12.)
Plaintiffs’ argument that the 2009 compensation was excessive because the compensation/revenue ratio increased to a record 62% restates in different terms the underlying reality discussed above. The compensation/revenue ratio increased because the decrease in compensation (13%) did not perfectly correspond to the decrease in revenue (17%). As discussed, the court found no evidence to suggest that this misalignment exceeded the Board’s ordinary discretion to set compensation. The result is the same even if the media finds the particular *676 revenue/compensation ratio to be “astonishing.” (Matter of Viacom Inc., 2006 NY Slip Op 30630[U], *16 [Sup Ct, NY County, June 23, 2006] [“editorials do not establish facts and cannot be the basis of a complaint”].) A contrary finding would undermine the policy behind the demand rule to screen out claims that rest “only [on] a suspicion expressed solely in conclusory terms,” whether the suspicion is harbored by the shareholders or shared by the media. (See Grimes at 1217 [emphasis supplied].) Succinctly, plaintiffs fail to raise a reasonable doubt that the 2006, 2007, and 2009 employee compensations were excessive in light of the company’s performance.
Plaintiffs’ allegations that the directors set the level of total compensation without regard to employee contributions overlap with their allegations of waste and are, therefore, addressed together. “The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes. ... It is common sense that a transfer for no consideration amounts to a gift or waste of corporate assets.” (Michelson v Duncan, 407 A2d 211, 217 [Del 1979].) Where some consideration is given, “a waste claim must rest on the pleading of facts that show that the economics of the transaction were so flawed that no disinterested person of right mind and ordinary business judgment could think the transaction beneficial to the corporation.” (Harbor Fin. Partners v Huizenga, 751 A2d 879, 893 [Del Ch 1999].) “[I]f, under the facts pled in the complaint, any reasonable person might conclude that the deal made sense, then the judicial inquiry ends.” (Id. at 892 [internal quotation marks omitted].) In other words, “[a] claim of waste will arise only in the rare, unconscionable case where directors irrationally squander or give away corporate assets.” (Brehm 2 at 74 [citations and internal quotation marks omitted].) In reviewing a particular compensation, the court may consider evidence of what other employees similarly situated received. (See Wilderman at 615.)
Plaintiffs claim that in 2006, when Morgan Stanley’s revenues and profits were at their peak, directors acted in bad faith by conferring the rewards of high-risk trades to employees rather than shareholders. It is, however, settled law in Delaware that the declaration and payment of dividends to shareholders and compensation to employees rest in the discretion of the corporation’s board of directors in the exercise of its business judgment. (See Gabelli & Co., Inc. v Liggett Group Inc., 479 A2d 276, 280 [Del 1984] [for dividends]; Pogostin 2, 1983 WL 17985, *677 *4, 1983 Del Ch LEXIS 437, *12 [for employee compensation].) “[B]efore the courts will interfere with the judgment of the board of directors in [decisions concerning dividends], fraud or gross abuse of discretion must be shown.” (Gabelli at 280.) Plaintiffs provide no “particularized facts” supporting a claim of fraud or gross abuse of discretion regarding the Board’s distribution of dividends in 2006. The court, therefore, cannot substitute its own judgment for that of Morgan Stanley’s board regarding the allocation of rewards from high-risk trades for that year.
Next, plaintiffs argue that the directors’ disregard of their responsibilities is “evident when one considers the argument, made by Defendants . . . that Morgan Stanley’s compensation was ‘reasonable’ when compared to the compensation awarded at other financial institutions.” According to plaintiffs, this amounts to a concession by the directors that they “simply followed a policy of matching what the Company’s competitors paid its employees.” This inference is unwarranted. Evidence of what other employees similarly situated received is relevant to determining the reasonableness of a particular compensation and, ultimately, whether compensation was so unconscionable as to constitute gross negligence or waste on the part of a board. 6See Wilderman at 615; Brehm 2 at 74.) In offering relevant evidence of compensation by Morgan Stanley’s competitors, the directors do not, thereby, admit that this was the only factor that they considered in making their own compensation decisions.
Finally, with respect to their argument for waste of corporate assets, plaintiffs do not claim that Morgan Stanley received no consideration from its employees in return for the compensation it paid them, but, rather, that the consideration it received was “disproportionately small.” (See In re National Auto Credit, Inc. Shareholders Litig., 2003 WL 139768, *13, 2003 Del Ch LEXIS 5, *47 [Jan. 10, 2003] [defining waste as an exchange of corporate assets for consideration so disproportionately small as to lie beyond range at which any reasonable person might be willing to trade].) According to plaintiffs, the consideration received was disproportionately small because the employees caused substantial damage to shareholder capital and the company’s overall financial health. As evidence, plaintiffs offer the steady decline in the price of Morgan Stanley’s stock as well as the decline in revenues and profits. They add that Morgan Stanley’s investments would have caused the company to col *678 lapse but for a $10 billion TARP loan by the federal government, and capital injections by private parties which further diluted existing shareholders.
“A court is confronted with inherent difficulties in determining whether payments for services are ‘reasonable’ or ‘excessive’. The value of services is obviously a matter of judgment on the part of the person who must pay for them.” (Saxe v Brady, 40 Del Ch 474, 487, 184 A2d 602, 610 [1962].) “Nevertheless, it is clear both in law and in fact that compensation payments may grow so large that they are unconscionable.” (Id.)
The complaint fails to allege particularized facts raising a reasonable doubt that the compensation paid by Morgan Stanley during the relevant years was “disproportionately” large or “unconscionable” in light of employee contributions. The only particularized facts that might be relevant to the issue of employee contributions concern the company’s subprime mortgage-related investments which allegedly forced the company to record $9.4 billion of write-downs in 2007, receive bailout loans from the government, and other private capital infusions. Plaintiffs, however, fail to allege any facts that tie these events to any specific employee’s, or group of employees’ performance, let alone facts that show that the Board was or should have been aware of this connection at the time the specific compensation decisions were made. Both failures distinguish this case from Citigroup where plaintiffs challenged the particular compensation paid to the company’s departing CEO and the court excused demand. (See Citigroup, 964 A2d at 138.) In Citigroup, plaintiffs alleged both that the CEO, in part, was responsible for the company’s losses related to the purchase of $2.7 billion in subprime loans and that the challenged compensation was approved by the Board after it became aware of these losses.
By contrast, here, plaintiffs do not allege that Morgan Stanley’s losses were caused in whole or in part by any particular employee or group of employees whose compensation they challenge. More importantly, plaintiffs argue, with the benefit of hindsight, that the compensation paid by Morgan Stanley in 2006 was unconscionably high if one considers the losses that the company suffered a year later, in 2007. It is “the essence of the business judgment rule that a court will not apply 20/20 hindsight to second guess a board’s decision.” (In re Walt Disney Co. Derivative Litig., 731 A2d 342, 362 [Del Ch Ct 1998], revd in pari on other grounds by Brehm 1.) Plaintiffs’ allegation that Morgan Stanley’s employees caused substantial damage to *679 shareholder capital and the company’s overall financial health is also unspecific as to employee and compensation and, ultimately, conclusory. As such, it cannot raise a reasonable doubt that the compensation paid by Morgan Stanley to its employees was unconscionably high in light of employee contributions. In sum, the complaint fails to raise a reasonable doubt that a majority of the Board is disinterested.
2. Independence
“Independence means that a director’s decision is based on the corporate merits, of the subject before the board rather than extraneous considerations or influences.” (Aronson at 816.) “The mere fact that a director was on the Board at the time of the acts alleged in the complaint does not make that director interested or dependent so as to infringe on his ability to exercise his independent business judgment of whether to proceed with the litigation.” (Kaplan v Wyatt, 499 A2d 1184, 1189 [Del 1985].) “Even a director’s approval of the transaction in question does not establish a lack of independence.” (Id.) “Allegations of natural bias not supported by tangible evidence of an interest ... in the outcome of the litigation do not demonstrate a lack of independence.” (Id.)
Plaintiffs claim that the nonemployee directors lack independence because they are “beholden to Morgan Stanley and its executives.” As evidence, plaintiffs first offer the annual stipends paid to the nonemployee directors for their services as board members, which vary from $325,000 to $376,733. The allegation that directors are paid fees for their services, without more, does not establish lack of independence. (Grobow at 188.) However, “the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director’s fee.” (Orman v Cullman, 794 A2d 5, 29 n 62 [Del Ch 2002].) The complaint contains no allegations regarding what is commonly understood and accepted to be a usual and customary director’s fee. Therefore, it fails to raise a reasonable doubt about the nonemployee directors’ independence.
The cases plaintiffs cite in support of the conclusion that the directors’ fees in this case are not “usual and customary” are distinguishable. Plaintiffs cite National Auto Credit as holding that substantially lower directors’ fees than those paid by Morgan Stanley to its nonemployee directors raised a reasonable doubt about director independence. (See In re National Auto Credit, Inc. Shareholders Litig., 2003 WL 139768, 2003 *680 Del Ch LEXIS 5 [Jan. 10, 2003].) This interpretation is contrary to the holding of that case. (2003 WL 139768, *10-11, 2003 Del Ch LEXIS 5, *38-41.) The court in National Auto Credit did not hold that the fees were in themselves “large amounts paid on a regular basis; rather, the Directors’ Fees were the product of massive increases which reasonably can be inferred to have been granted in return for the Defendant Directors’ support of [certain agreements],” which the court found to be “the essence of quid pro quo.” (2003 WL 139768, *11, 2003 Del Ch LEXIS 5, *40.) Plaintiffs in this case make no allegation that the nonemployee directors’ fees were massively increased or that they were awarded as quid pro quo for a specific directorial action.
Nor are the other cases cited by plaintiffs apposite. In In re The Limited Inc. Shareholders Litig., the court found that “continued annual compensation in excess of $150,000 would be material to ... a senior university official, and that [he] was beholden to [the company’s President and CEO] for the continuation of [personal] consulting services” to the company and one of its subsidiaries. (2002 WL 537692, *6, 2002 Del Ch LEXIS 28, *23 [Mar. 27, 2002].) No such facts supporting materiality are alleged in this case with regard to any nonemployee director of Morgan Stanley. (See Orman, 794 A2d at 24 [discussing materiality].) Similarly in Kahn, an $88,980 director’s fee gave rise to questions of independence, because the director, Donelan, was also paid as the trustee of an investment trust, which was, in turn, controlled by another director, Portnoy. (Kahn v Portnoy, 2008 WL 5197164, 2008 Del Ch LEXIS 184 [Dec. 11, 2008].) The court found that Donelan was beholden to Portnoy for his compensation as trustee. Plaintiffs allege no inter-directorial relations in this case. Hence, plaintiffs’ allegations and legal contentions about Morgan Stanley’s nonemployee directors’ fees fail to raise a reasonable doubt about these directors’ independence.
Plaintiffs, next, argue that some of the nonemployee directors are beholden to Morgan Stanley’s executives because the executives have the power to harm the directors’ financial interests. More specifically, the complaint states that defendant Olayan is senior director and executive of The Olayan Group (the Group), which conducts significant business with Morgan Stanley. According to the complaint, Morgan Stanley and the Group, among others, are owners of Bracor, a real estate investment company that recently invested $500 million in a business center in Sao Paulo. “[T]he existence of contractual relationships with *681 companies that directors are affiliated with potentially makes the board’s decision more difficult, but it does not sterilize the board’s ability to decide.” (Jacobs v Yang, 2004 WL 1728521, *6, 2004 Del Ch LEXIS 117, *23 [Aug. 2, 2004] [citations omitted].) Director’s independence is not in doubt when the complaint fails to “assert particularized facts establishing that the business relationships are material” to the company with which the director is affiliated. (2004 WL 1728521, *6, 2004 Del Ch LEXIS 117, *24 [emphasis supplied].) Here, the complaint contains no allegations regarding the Group’s ownership interest in Bracor or its significance relative to the Group’s other holdings. For this reason, there is no evidence to suggest that the business relationship between Morgan Stanley and the Group is sufficiently material to the Group to raise a reasonable doubt about Olayan’s independence.
Plaintiffs also claim that Phillips lacks independence because he is a director of Oracle and owns in excess of three million shares of that company. “[T]he Delaware Supreme Court has rejected an objective ‘reasonable director’ test and instead requires the application of a subjective ‘actual person’ standard to determine whether a particular director’s interest is material and debilitating . . . .” {Orman, 794 A2d at 24.) Under this “actual person” standard, a payment stream that is material and debilitating to a director of limited financial means might be entirely immaterial to a wealthy director. The complaint provides no particularized facts regarding the significance of Phillips’ equity interest in Oracle relative to his total holdings. As a result, it raises no reasonable doubts about whether Phillips’ interest in Oracle is material. More importantly, under the Sarbanes-Oxley Act, Morgan Stanley’s analysts are subject to rules intended to insulate them from pressures by their firm which might compromise their independent analytical opinions. {See Pub L 107-204, 307, 116 US Stat 745, § 501 [107th Cong, 2d Sess, July 30, 2002].) There are no allegations suggesting that these statutory protections would prove ineffective in this case. Thus, plaintiffs fail to raise a reasonable doubt about Phillips’ independence.
Similarly, plaintiffs fail to raise a reasonable doubt about Noski’s and Sexton’s independence. Plaintiffs challenge Noski’s independence based on his prior partnership with Deloitte & Touche, which allegedly earns significant fees from Morgan Stanley. Plaintiffs’ only allegation with respect to Sexton is that he was a banker at Morgan Stanley from 1973 to 1995. “[M]ere *682 recitation of the fact of past business relationships will not make the Court automatically question the independence of a challenged director.” {Orman, 794 A2d at 27 n 55.) Hence, the complaint fails to raise a reasonable doubt about Noski’s or Sexton’s independence.
Finally, plaintiffs fail to raise a reasonable doubt about Bostock’s independence. They argue that Bostock lacks independence because his son-in-law is the co-CEO of FrontPoint, a subsidiary of Morgan Stanley. Plaintiffs’ argument fails for the simple reason that demand should be excused only if the lawsuit is both meritorious and beneficial to Morgan Stanley. (See Starrels, 870 F2d at 1173-1174.) If the lawsuit were beneficial to Morgan Stanley, the court finds no reason why the same lawsuit would disadvantage its subsidiary, FrontPoint, and indirectly Bostock’s son-in-law. On the contrary, if the lawsuit were beneficial to Morgan Stanley, Bostock’s interest would be aligned with that of his son-in-law, which, in turn, would be aligned with those of Morgan Stanley, FrontPoint, and, ultimately the plaintiffs. (See In re American Intl. Group, Inc. Derivative Litig., 700 F Supp 2d 419, 434 [SD NY 2010] [fact that executive and his daughter were employed by company merely indicates that his interests were aligned with the company’s interests, and not ground for challenging his disinterestedness].) Moreover, plaintiffs’ allegation that Morgan Stanley’s executives have the power to deprive Bostock’s son-in-law of significant compensation is conclusory in the absence of particularized facts about the extent of control that Morgan Stanley’s executives exercise over FrontPoint’s compensation decisions. In sum, the complaint fails to raise a reasonable doubt that a majority of the Board is independent.
3. Protection Under the Business Judgment Rule
“The . . . business judgment inquiry of Aronson, focuses on the substantive nature of the challenged transaction and the board’s approval thereof . . . [T]he transaction is reviewed against the factual background of the complaint to determine whether a reasonable doubt exists at the threshold that the challenged action was a valid exercise of business judgment.” {Pogostin 1 at 624.)
“The business judgment rule . . . protects directors from liability for their decisions so long as ... a challenged decision does not constitute . . . waste.” (Robotti & Co., LLC v Liddell, 2010 WL 157474, *11, 2010 LEXIS 4 *46-47 [Jan. 14, 2010].) *683 Plaintiffs claim that demand is excused under the second prong of the Aronson test because the directors’ approval of total compensation for 2006, 2007, and 2009 constituted waste. As discussed in connection with the issue of director interestedness, the complaint fails to raise a reasonable doubt that the compensations approved for 2006, 2007, and 2009 constituted waste. Ergo, there is no reasonable doubt that the respective Board approvals were not a valid exercise of business judgment. (See Pogostin 1 at 624.)
In conclusion, the complaint fails to show that demand on Morgan Stanley’s board of directors would be futile because it fails to raise a reasonable doubt that a majority of the Board is disinterested, independent, or that the Board’s decision is protected by the business judgment rule. The demand requirement under rule 23.1 is, therefore, neither excused nor satisfied.
B. Executive Officers’ Motion to Dismiss
The merits of the motion to dismiss by the executive officers and nominal defendant Morgan Stanley need not be reached in light of the court’s conclusion that the pre-suit demand requirement is not satisfied.
Accordingly, it is ordered that the motion to dismiss the complaint by Morgan Stanley’s independent directors is granted and the Clerk is directed to enter judgment dismissing the complaint with prejudice.