**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

KATHALEEN ST. JUDE MCCORMICK
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: October 13, 2025
Date Decided: January 30, 2026

Joseph R. Slights III
Brad D. Sorrels
Daniyal M. Iqbal
Nora M. Crawford
Jordan L. Cramer
Ashleigh L. Herrin
WILSON, SONSINI, GOODRICH
 & ROSATI, P.C.
222 Delaware Avenue, Suite 800
Wilmington, DE 19801

Gregory V. Varallo
Mae Oberste
BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP
500 Delaware Avenue, Suite 901
Wilmington, DE 19801

Elena C. Norman
Paul J. Loughman
Alex B. Haims
YOUNG CONAWAY STARGATT
 & TAYLOR, LLP
Rodney Square 1000 North King St.
Wilmington, DE 19801

Re: *Adam Grabski ex rel. Coinbase Global, Inc.,
v. Marc Andreessen, et al.*, C.A. No. 2023-0464-KSJM

Dear Counsel:

This letter resolves the motion to strike and the motion to terminate and filed

by Coinbase Global, Inc.'s Special Litigation Committee (the "SLC").[1] The motion to

strike is granted. The motion to terminate is denied.

---

[1] Terms not defined in this decision have the same meaning as in *Grabski ex rel. Coinbase Glob., Inc. v. Andreessen*, 2024 WL 390890 (Del. Ch. Feb. 1, 2024).

## I.    FACTUAL BACKGROUND

The court assumes the reader's familiarity with the factual and procedural history of this case. This decision recounts the facts germane to the pending motions.[2]

### A.    The Board Forms The SLC.

To recap, Coinbase went public through a direct listing on April 14, 2021 (the "Direct Listing"). In the Direct Listing, Defendants sold Coinbase stock worth approximately $2.9 billion unrestrained by a lock-up period (the "Challenged Trades"). A month later, the Company announced disappointing quarterly earnings and that it was raising capital through a notes offering. After this announcement, the Company's stock price plummeted. By selling their shares before the announcement, Defendants avoided losses of approximately $1.09 billion.

Plaintiff bought Coinbase stock on the first day of the Direct Listing. He filed this action on April 26, 2023, asserting claims for breach of fiduciary duty and unjust enrichment against the Director Defendants and Officer Defendants who sold stock in the Direct Listing. When Plaintiff filed this action, the Coinbase Board comprised Brian Armstrong, Marc Andreessen, Frederick Ernest Ehrsam III, Kathryn Haun,

---

[2] The SLC redacted portions of the publicly filed versions of the SLC Report (defined below) and the exhibits to the SLC Report, including deposition transcripts. C.A. No. 2023-0464-KSJM, Dockets ("Dkts.") 107, 108. This decision cites to portions of the redacted material that are "material to [the public's] understanding [of] the nature of the dispute." *In re Oxbow Carbon LLC*, 2016 WL 7323443, at *2 (Del. Ch. Dec. 15, 2016) (internal quotation marks omitted) (quoting *Al Jazeera Am., LLC v. AT & T Servs.*, 2013 WL 5614284, at *7 (Del. Ch. Oct. 14, 2013)). The court's decision to cite to portions of the redacted material is without prejudice to the SLC's ability to argue that other aspects of the redacted material should remain confidential.

Fred Wilson, Kelly Kramer, Gokul Rajaram, and Tobias Lutke. All but Lutke were members of the Board at the time of the Direct Listing.

Relevant to the SLC motions, Andreessen held his Coinbase interests through Andreessen Horowitz, a venture capital firm.[3] Andreessen is a co-founder and has been a general partner of Andreessen Horowitz since July 2009. Andreessen Horowitz is one of the largest venture capital firms in Silicon Valley.[4]

Andreessen Horowitz first invested in Coinbase in 2013, leading a $25 million Series B round. Thereafter, Andreessen Horowitz invested in each of Coinbase's significant funding rounds. Andreessen Horowitz's exit of its investment in Coinbase in connection with the Direct Listing was the firm's largest exit in its history. Through it, Andreessen Horowitz sold over $118.7 million of Coinbase stock.[5]

Defendants moved to dismiss the Complaint under Court of Chancery Rules 23.1 and 12(b)(6).[6] On February 1, 2024, the court denied the motion.[7] The court held that Plaintiff had pled with particularity that demand was futile against the Director Defendants, who made up more than half of the Board.[8] The court also held that it was reasonably conceivable that Defendants possessed material, non-public information, including a Section 409A report determining Coinbase's fair value (the

---

[3] Dkt. 53, Ex. A ("SLC Report") at 39.

[4] *See* SLC Report, Ex. B at 172:20–24; *id.*, Ex. C ("Rajaram Dep. Tr.") at 184:7–18.

[5] *See generally* Compl. ¶ 21.

[6] Dkt. 15.

[7] Dkt. 37.

[8] *Grabski*, 2024 WL 390890, at *12.

"Andersen Report") and other information about Coinbase's future financial performance.[9]  The court further held that Plaintiff adequately pled scienter based on the timing of the Challenged Trades, the absence of a lock-up, and the resulting cash payout.[10]

Eight days after the court issued the dismissal decision, the Board formed the SLC.  The court granted the SLC's motion to stay the litigation to allow it to investigate the claims set forth in the Complaint.[11]  The SLC conducted a ten-month investigation resulting in a 332-page report (the "SLC Report").[12]  The SLC Report concluded that this litigation lacks merit.  On February 3, 2025, the SLC moved to terminate the litigation.

### B.    The SLC Members

The SLC comprises two members: Kelly Kramer and Gokul Rajaram.[13]  Neither sold shares in the Direct Listing.[14]

Kramer has worked in the health and tech industries and has served on two other public company boards.[15]  She has served as an independent director on Coinbase's Board since 2020.[16]  She chairs the audit and compliance committee and

---

[9] *Id.* at *9–11.

[10] *Id.* at *10–11.

[11] Dkt. 42.

[12] SLC Report at 30.

[13] *Id.* at 23–25.

[14] *Id.* at 25, 27.

[15] *Id.* at 24.

[16] *Id.*

4

serves on the compensation committee.[17] Previously, Kramer was the Chief Financial Officer of Cisco Systems, Inc. and Chief Financial Officer of GE Healthcare Systems under General Electric. Kramer has no prior relationship with any member of Coinbase's Board or management team.[18] Plaintiff does not challenge her independence.

Rajaram has served in executive capacities across the tech industry, including at Facebook and Google.[19] He started Chai Labs, Inc., which Meta acquired. Rajaram joined Coinbase as an independent director in 2020. He serves on the compensation committee.[20]

Plaintiff challenges Rajaram's independence based on his economic and professional ties to Andreessen and Andreessen Horowitz.

In 2007, Andreessen invested approximately $200,000 in Rajaram's startup, Chai Labs. That investment was reported to be approximately 16% of the capital raised then.[21] The Chai Labs website listed Andreessen as a member of its three-person advisory board.[22] Rajaram testified that Chai Labs used Andreessen's name and reputation to attract talent and investors.[23]

---

[17] *Id.*

[18] *Id.* at 24–25.

[19] *Id.* at 25–26.

[20] *Id.* at 26.

[21] SLC Report at 25–26; Rajaram Dep. Tr. at 62:11–15, 96:5–10; Dkt. 62 ("Pl.'s Mot. to Compel"), Ex. A at 4–5.

[22] Dkt. 77 ("Pl.'s Opp. Br."), Ex. 2.

[23] Rajaram Dep. Tr. at 99:4–6, 101:21–102:4.

In 2010, Rajaram invested in a fund affiliated with Andreessen.[24] That same year, Facebook acquired Chai Labs for approximately $10 million in an "acqui-hire"— that is, a deal to acquire talent.[25] As of the acquisition, Andreessen was a member of both the Facebook board of directors and Chai Labs' board of advisors.[26] Rajaram testified that his proceeds from the Chai Labs sale represented nearly half of his net worth at the time.[27] After the acquisition, Rajaram worked in senior advertising engineering roles at Facebook for years while Andreessen was on the Facebook board.[28]

Rajaram's primary investment vehicle during the years leading up to the SLC investigation was Firebolt Ventures.[29] Rajaram was a member of its leadership team and was actively involved in investment decisions.[30] Rajaram, either personally or through Firebolt, invested in financing rounds alongside Andreessen Horowitz at least 50 times since 2019.[31] Between 2020 and 2023, Andreessen invested $850,000 in Firebolt.[32] While the SLC was conducting its investigation, Firebolt's website listed Andreessen and another partner at Andreessen Horowitz as two of eleven

---

[24] SLC Report at 26–27.

[25] Rajaram Dep. Tr. at 106:25–108:16.

[26] Pl.'s Mot. to Compel, Ex. D at 7; Pl.'s Opp. Br., Ex. 2.

[27] Rajaram Dep. Tr. at 110:13–20.

[28] *Id.* at 104:3–8, 298:17–20.

[29] Rajaram Dep. Tr. at 125:9–19.

[30] *Id.* at 250:21–251:11, 378:20–379:25, 391:16–23; Pl.'s Opp. Br., Ex. 26.

[31] *See, e.g.,* Pl.'s Opp. Br., Exs. 3–7; Rajaram Dep. Tr. at 127:20–129:3.

[32] SLC Report at 26.

"Strategic LPs for Deal Flow, Diligence, Follow-ons, Exits."[33] Rajaram testified that large leader-type funds like Andreessen Horowitz often "solicit people, smaller funds, angels, et cetera, to fill [funding] round[s]."[34] According to PitchBook, Rajaram is in the top 1% of most frequent investors in funding rounds led by Andreessen Horowitz.[35] Rajaram avoided placing a hard value on those investments during his deposition, but he testified that they could be worth $2 to $4 million.[36] Rajaram also testified that Andreessen "didn't do anything to help [Firebolt] in any way," and was only listed on the website for marketing purposes, but agreed that Firebolt was representing to others that Andreessen "can help provide dealflow."[37]

The deal flow went both ways. During the SLC's investigation, Rajaram exchanged hundreds of emails with the Andreessen Horowitz team.[38] The SLC described many as "cut-and-paste emails Rajaram would quickly send to numerous venture capital firms"[39] to make introductions between Andreessen Horowitz and founders looking for investment or collaboration.[40] But Rajaram is a familiar name

---

[33] Pl.'s Opp. Br., Ex. 26.

[34] Rajaram Dep. Tr. at 266:4–15.

[35] Pl.'s Mot. to Compel, Ex. F. The court acknowledges that the PitchBook data might not be totally accurate or complete, but it is still a relevant source of information.

[36] Rajaram Dep. Tr. at 111:21–24; 385:10–12.

[37] *Id.* at 268:14–269:23.

[38] SLC Opening Br., Ex. J at 3.

[39] *Id.* at 54–55.

[40] *See, e.g., id.*, Ex. R; Pl.'s Opp. Br., Exs. 28–31, 34, 37–39, 41–45, 47.

7

to members of Andreessen Horowitz's investment team. After one referral from Rajaram, they praised him as "our MVP!!!!"[41]

Rajaram testified that these referrals were for his own "satisfaction," but he also hoped for the relationship to have some positive impact on his own investment activity.[42] In one email sent during the SLC's investigation, Rajaram asked an Andreessen Horowitz team member: "Please do keep me in mind for value-added angel investors in your investments :)"[43]

Rajaram felt confident that he was independent.[44] He viewed his financial dealings with Defendants as *de minimis*. In his mind, the investments he had made alongside Andreessen Horowitz "didn't really matter," because they were "negative financially," meaning they had yet to generate profit and had no impact on his net worth.[45] He testified: "[M]y dealings with the defendants occupy no space in mind. It's not something that I even think about. . . . [I]t's not something that affects my life or my personal situation[.]"[46] Rajaram concluded that from a financial, personal, or professional perspective, he had no material ties to Andreessen.[47] He would sue Defendants, without hesitation, if the SLC's investigation so required.[48] "If

---

[41] Pl.'s Opp. Br., Ex. 44.

[42] Rajaram Dep. Tr. at 144:1–145:8; 180:20–182:8.

[43] *Id.*, Ex. 28.

[44] Rajaram Dep. Tr. at 39:1–7; 48:13–18.

[45] *Id.* at 384:9–16.

[46] *Id.* at 49:25–50:4; *see also id.* at 49:21–25.

[47] *Id.* at 384:21–23.

[48] *Id.* at 48:20–22; 385:25–386:11.

[Andreessen Horowitz] disappeared, that's okay. If they stayed around that's okay. . . . [He] was indifferent."[49]

## C. The SLC Counsel

After interviewing seven law firms, the SLC retained Wilson Sonsini Goodrich & Rosati, P.C. as legal counsel.[50] Plaintiff challenges Wilson Sonsini's independence.

Wilson Sonsini ran a conflict check in connection with their potential representation of the SLC.[51] The report focused on Defendants, including Andreessen. Wilson Sonsini's conflict report reflected no open matters for any of the named Defendants, including Andreessen.

Wilson Sonsini has represented Andreessen in the past. The firm "represented Netscape in its [1995] IPO—widely considered [as] the dawn of the internet era" and a seminal moment for Netscape's co-founder Andreessen.[52] In the 2000s, Wilson Sonsini represented Andreessen personally in securities litigation involving Loudcloud, as well as in shareholder derivative actions involving Blue Coat Systems.[53] During the 2022 litigation between Twitter, Inc. and Elon Musk, Wilson Sonsini retained conflicts counsel to serve a subpoena on Andreessen.[54]

---

[49] *Id.* at 384:23–25.

[50] Dkt. 42 at 2.

[51] SLC Opening Br., Ex. G ("Slights Dep. Tr.") at 189:3–6.

[52] Pl.'s Opp. Br., Ex. 53; *id.*, Ex. 54 at 3–4.

[53] Slights Dep. Tr. at 187:22–188:4; *see* Pl.'s Opp. Br., Exs. 55, 65.

[54] *See* Pl.'s Opp. Br., Exs. 57, 58.

9

Wilson Sonsini also searched for active matters involving Defendants' affiliates, including Andreessen Horowitz.[55] Wilson Sonsini had the following "open client matters involving entities affiliated with" Defendants, which it disclosed to the SLC:[56] providing general fund advice for Andreessen Horowitz; advising a confidential startup founded by Surojit Chatterjee; providing trademark advice for a venture capital firm affiliated with Kathryn Haun; and providing general commercial work for a firm affiliated with Fred Ehrsam.[57] Wilson Sonsini estimated that those representations would produce approximately $800,000 in fees and disclosed that the firm did not believe that those representations were "material or would impact [its] independence."[58]

It is unclear whether the conflict report distinguished between Defendants' affiliates generally and affiliates involved in the Challenged Trades. Wilson Sonsini did not view the open representations of Defendants' affiliates—even those affiliates involved in the Challenged Trades—as conflicts barring representation of the SLC.[59]

Wilson Sonsini represented Andreessen Horowitz while representing the SLC. During the SLC investigation, Wilson Sonsini represented Andreessen Horowitz in at least ten financing rounds raising over $700 million.[60] The team advising the SLC

[55] Slights Dep. Tr. at 189:3–6.

[56] *Id.* at 189:8–25, 239:25–240:6; SLC Opening Br., Ex. H.

[57] SLC Opening Br., Ex. H.

[58] *Id.*

[59] Slights Dep. Tr. at 189:18–191:18.

[60] Pl.'s Opp. Br. Exs. 59–66.

10

did not overlap with the team advising Andreessen Horowitz.[61] The team advising the SLC did not receive incremental updates on the new financing transactions on which the firm advised Andreessen Horowitz as part of its "general fund advice."

Plaintiff argues that Wilson Sonsini harbored ideological conflicts impeding its representation of the SLC, but that argument is conjectural. It is true that Wilson Sonsini has built a reputation as the go-to law firm for Silicon Valley. But former Vice Chancellor Joseph R. Slights III, who decided cases against prominent Silicon Valley figures during his tenure on the bench,[62] led the Wilson Sonsini team that advised the SLC.[63] And Wilson Sonsini cleared the conflict check knowing that it was possible that the SLC might recommend pursuing Plaintiff's claims.[64] Slights testified during his deposition that he would have had no compunction recommending that the SLC pursue claims against Defendants.[65] Plaintiff does not challenge Slights's testimony or independence.

### D.     The SLC Findings

The SLC reviewed roughly 60,000 documents, collecting materials from 31 document custodians and interviewing 21 witnesses.[66] Houlihan Lokey served as the

---

[61] Slights Dep. Tr. at 190:20–191:2.

[62] *See Id.* at 220:5–23 (discussing cases)

[63] *See* SLC Opening Br. at 17.

[64] *See* Slights Dep. Tr at 216:20–217:3.

[65] *Id.* at 214:21–216:15.

[66] SLC Report at 3, 34.

SLC's independent financial advisor.[67] After completing its investigation, the SLC concluded that the Complaint's allegations lack merit.[68]

The SLC found no evidence to suggest that Defendants pursued the Direct Listing for their personal benefit or because it would involve reduced oversight. According to the SLC, Coinbase concluded that its strong financials and its institutional interest in financial transparency militated in favor of the Direct Listing.[69]

The Board and management decided on a direct listing by initiating a "RAPID," Coinbase's internal decision-making tool. According to the SLC, CEO Armstrong and the Board preferred a direct listing, while officers Haas, Chatterjee, Aggarwal, and Choi supported a modified IPO.[70] Ultimately, Armstrong decided that Coinbase would pursue the Direct Listing for these reasons:

> (i) "We don't need to raise money right now"; (ii) "I don't trust the modified IPO process" (noting recent examples he deemed "wildly underpriced"); (iii) "I want to have the market tell us the fair price, not have to guess (or ask someone else to guess) the fair price"; and (iv) a direct listing is "more in line with the ethos of crypto to have a fair open market for all participants."[71]

The SLC found no evidence that any Defendant was interested in selling large blocks of shares. According to the SLC, many Defendants did not want to sell their

---

[67] *Id.* at 3.

[68] *Id.* at 329.

[69] *Id.* at 95–99.

[70] *Id.* at 88, 98–99.

[71] *Id.* at 100–01.

shares at all and only did so to create a liquid market for the stock.[72]  It was Coinbase that rejected a lock-up because a lock-up period risked constraining supply for the Direct Listing.[73]

The SLC found no evidence that any Defendant possessed MNPI in connection with the Direct Listing.  Coinbase identified MNPI concerns early and structured both the Secondary Trading Program and the Direct Listing to avoid MNPI exposure for directors and officers.  No Defendant believed that he or she held MNPI at the time of the Challenged Trades, and Coinbase had disclosed all material information concerning its financial condition before the Direct Listing.[74]

The SLC concluded that the Andersen Report did not constitute MNPI because it would not be material to a rational investor.[75]  The SLC noted that Coinbase had received multiple, widely varying valuations before the Direct Listing and explained that investors and executives often view 409A valuations with skepticism due to their regulatory limits and narrow purpose.[76] According to the SLC, companies have a bias toward keeping 409A valuations as low as possible to minimize the risk of under-withholding taxes associated with employee stock options.[77]  And the SLC found no

---

[72] *Id.* at 76–77.

[73] *Id.* at 126–27.

[74] *Id.* at 225–26, 229.

[75] *Id.* at 236.

[76] *Id.* at 236–37.

[77] *Id.* at 237–38.

evidence that Defendants considered the Andersen Report when making the Challenged Trades.[78]

The SLC also considered the allegations that management pursued a direct listing based on non-public information about fee compression. The SLC acknowledged that management "worried about" fee compression[79] but stated that witnesses did not recall focusing on fee compression during Board meetings before the Challenged Trades.[80] Management viewed fee compression as a long-term concern, and analysts had cautioned Coinbase about fee compression risks in the brokerage industry.[81] But the SLC concluded that fee compression did not drive the decision to opt for a direct listing and that Coinbase had disclosed the related risks in its public disclosures.[82] The SLC also found no evidence that Coinbase was experiencing any fee compression before the Direct Listing.[83]

### E. The SLC Moves To Terminate This Litigation.

In February 2025, The SLC filed a motion to terminate the litigation, attaching the SLC Report.[84] The court entered a scheduling order for Plaintiff's *Zapata* discovery.[85] The order stipulated that *Zapata* discovery, including any depositions,

---

[78] *Id.* at 239–40.

[79] *Id.* at 190.

[80] *Id.* at 186, 268.

[81] *Id.* at 193.

[82] *Id.* at 263.

[83] *Id.* at 265, 268.

[84] Dkt. 53.

[85] Dkt. 56.

would be completed by June 6, 2025.[86]  On May 15, Plaintiff moved to compel responses related to the independence of Wilson Sonsini and Rajaram.[87]  A day later, the parties came to an agreement to allow certain depositions to take place in mid-June.[88]  The court entered a revised scheduling order on July 7.[89]

After the SLC filed its opening brief on July 8, Plaintiff asked for an extension for the answering brief and revealed that he sought to introduce expert opinions.[90] Plaintiff's answering brief, filed on August 19, referenced three expert opinions contained in reports filed with the brief.[91]  The SLC filed a motion to strike those opinions, arguing that they were introduced after the close of discovery and left the SLC with no opportunity to cross-examine the experts or submit rebuttal opinions.[92] The parties completed briefing on the motion to strike on September 4,[93] and briefing on the motion to terminate on September 23.[94]  The court heard oral argument on both motions on October 13.[95]

---

[86] *Id.*

[87] Dkt. 62

[88] Dkt. 63.

[89] Dkt. 71.

[90] Dkts. 72, 76; Dkt. 82 ("SLC Mot. to Strike") ¶ 10.

[91] Dkts. 80, 81.

[92] SLC Mot. to Strike at ¶¶ 2,3.

[93] Dkt. 91.

[94] Dkt. 101.

[95] Dkt. 106.

## II. LEGAL ANALYSIS

The SLC has moved to strike the expert opinions submitted by Plaintiff and moved to terminate this litigation based on the SLC Report.

### A. Motion To Strike

The motion to strike the expert opinions is granted, solely because Plaintiff submitted expert opinions after the close of discovery. Plaintiff admitted to as much when he offered to modify the existing schedule to allow the SLC to depose his proffered experts.[96] The timing of the production created unfair surprise for the SLC.[97] The below analysis does not consider the experts' opinions.

### B. Motion To Terminate

Delaware law allows a corporation to shut down a derivative lawsuit after a stockholder plaintiff defeats a motion to dismiss by establishing an SLC. This is because "derivative claim[s] belong[] to the corporation, not to the shareholder plaintiff who brings the action."[98] Delaware courts thus permit the corporation a "last chance . . . to control a derivative claim" through an SLC process, even in cases where "a majority of its directors cannot impartially consider a demand."[99]

---

[96] *See* Dkt. 86 at 13.

[97] *See Levy v. Stern*, 1996 WL 742818, at *2 (Del. 1996) (TABLE); *IQ Hldgs., Inc. v. Am. Com. Lines Inc*, 2012 WL 3877790, at *1–2 (Del. Ch. Aug. 30, 2012); *In re ExamWorks Gp., Inc. S'holder Appraisal Litig*, 2018 WL 1008439, at *9 (Del. Ch. Feb. 21, 2018).

[98] *In re M & F Worldwide Corp. S'holders Litig.*, 799 A.2d 1164, 1174 n.31 (Del. Ch. 2002) (quoting *MAXXAM, Inc./Federated Dev. S'holders Litig.*, 698 A.2d 949, 956 (Del. Ch. 1996)).

[99] *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 939–40 (Del. Ch. 2003).

An SLC has the power to recommend any manner of outcome for a derivative suit—that it proceed in full or part, that it settles, or that the court terminate it.

*Zapata* sets the standard applied when evaluating a motion to terminate.[100] *Zapata* calls for a two-step analysis. As the first step, the court must "review[] the independence of SLC members and consider[] whether the SLC conducted a good faith investigation of reasonable scope that yielded reasonable bases supporting its conclusions."[101] If the SLC meets that burden, then the court "determines, in its own business judgment, whether the suit should be dismissed."[102] This second step is "wholly within the discretion of the court."[103]

Under *Zapata*, the court reviews an SLC's motion to terminate subject to what is in essence a summary judgment standard.[104] "[T]he movant has the burden of demonstrating the absence of any material issue of fact, and any doubt as to the existence of such an issue will be resolved against him."[105] For the purposes of a motion subject to *Zapata*, the SLC is not entitled to any favorable presumptions.[106]

---

[100] *See Zapata Corp. v. Maldonado*, 430 A.2d 779, 788–89 (Del. 1981).

[101] *London v. Tyrrell*, 2010 WL 877528, at *11 (Del. Ch. Mar. 11, 2010).

[102] *Diep ex rel. El Pollo Loco Hldgs., Inc. v. Trimaran Pollo P'rs, L.L.C.*, 280 A.3d 133, 158 (Del. 2022).

[103] *Id.* (cleaned up).

[104] *Id.* at 149.

[105] *Lewis v. Fuqua*, 502 A.2d 962, 966 (Del. Ch. 1985).

[106] *Kaplan v. Wyatt*, 484 A.2d 501, 507 (Del. Ch. 1984), *aff'd* 499 A.2d 1184 (Del. 1985).

17

Rather, the SLC bears the "burden to show the absence of a material issue of fact" as to its independence, good faith, and a reasonable investigation.[107]

### 1. First Step

To prevail on the first step of *Zapata*, the SLC must persuade the court that there is no material question of fact as to whether: "(1) its members were independent; (2) . . . they acted in good faith; and (3) . . . they had reasonable bases for their recommendations."[108] "If the Court determines that a material fact is in dispute on any of these issues it must deny the SLC's motion."[109] Of these three factors, Plaintiff advances arguments concerning the SLC's independence and the reasonableness of the SLC's investigation.[110] This analysis focuses on Plaintiff's challenges to the SLC's independence.

"In examining whether the SLC has met its burden to demonstrate that there is no material dispute of fact regarding its independence, the court must bear in mind the function of special litigation committees under our jurisprudence."[111] As then-Vice Chancellor Strine explained in *Oracle*, "the independence inquiry is critically important if the special committee process is to retain its integrity, a quality that is, in turn, essential to the utility of that process."[112]

---

[107] *El Pollo Loco*, 280 A.3d at 154; *see Zapata*, 430 A.2d at 788–89.

[108] *Oracle*, 824 A.2d at 928 (citing *Zapata*, 430 A.2d at 788–89); *London*, 2010 WL 877528, at *13 (stating the nature of the SLC's burden).

[109] *London*, 2010 WL 877528, at *12 (emphasis added).

[110] *See* Pl.'s Opp. Br. at 36–52.

[111] *Oracle*, 824 A.2d at 939.

[112] *Id.*; *see also El Pollo Loco*, 280 A.3d at 152.

"The composition and conduct of a special litigation committee therefore must be such as to instill confidence in the judiciary and, as important, the stockholders of the company that the committee can act with integrity and objectivity."[113] Nonindependence of one SLC member of a two-member SLC is sufficient alone to require denial of the SLC's motion.[114]

Whether an SLC member is independent is necessarily a "fact-specific determination made in the context of a particular case."[115]  "Unlike the demand-excusal context, where the board is presumed to be independent, the SLC has the burden of establishing its own independence."[116]  "SLC members are not given the benefit of the doubt as to their impartiality and objectivity."[117]

When assessing an SLC's independence, "the court must confront the personal and professional relationships between those who judge and those being judged."[118] The court examines whether the SLC members' connections to defendants "generate a reasonable doubt about the SLC's impartiality because they suggest that material

---

[113] *Oracle,* 824 A.2d at 940; *see also London*, 2010 WL 877528, at *16 ("SLC members should be selected with the utmost care to ensure that they can, in both fact and appearance, carry out the extraordinary responsibility placed on them to determine the merits of the suit and the best interests of the corporation, acting as proxy for a disabled board.").

[114] *See Oracle*, 824 A.2d at 944.

[115] *El Pollo Loco*, 280 A.3d at 152 (quoting *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004)); *see also Oracle*, 824 A.2d at 941 (same).

[116] *Beam*, 845 A.2d at 1055.

[117] *In re Baker Hughes, a GE Co., Deriv. Litig.*, 2023 WL 2967780, at *11 (Del. Ch. Apr. 17, 2023) (quoting *London*, 2010 WL 877528, at *11).

[118] *El Pollo Loco*, 280 A.3d at 151.

considerations other than the best interests of [the Company] could have influenced the SLC's inquiry and judgments."[119] This court looks "beyond determining whether SLC members are under the 'domination and control' of an interested director," and asks instead whether any "lesser affiliations . . . are substantial enough to present a material question of fact as to whether the SLC member can make a totally unbiased decision."[120] The court must be persuaded that each SLC member "is in a position to base his decision on the merits of the issue rather than being governed by extraneous consideration or influences."[121]

"At bottom, the question of independence turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind," and the analysis therefore focuses on "impartiality and objectivity."[122] The analysis is contextually "tailored"—because the court may presume that "special litigation committee members are persons of typical professional sensibilities," the key inquiry is whether "an unacceptable risk of bias" is present.[123]

To show its independence, an SLC generally must establish that it retained independent advisors. Delaware law recognizes that counsel for an SLC often leads

---

[119] *Oracle*, 824 A.2d at 947; *see also London*, 2010 WL 877528, at *14.

[120] *London*, 2010 WL 877528, at *12 (quoting *Oracle*, 824 A.2d at 937).

[121] *El Pollo Loco*, 280 A.3d at 152 (quoting *Kaplan*, 499 A.2d at 1189).

[122] *Oracle*, 824 A.2d at 938 (emphasis in original) (quoting *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del. Ch. 2001) *rev'd in part on other grounds*, 817 A.2d 149 (Del. 2002)).

[123] *Oracle*, 824 A.2d at 941–42, 947.

the investigation.[124]    And encouraging the involvement of experienced and knowledgeable advisors in this way bolsters the integrity of the SLC process where the SLC members remain actively engaged in the investigation.[125]  But it means that the advisors, too, must adhere to the rigorous standard of independence imposed on their clients.

Plaintiff argues that there are factual disputes concerning both Rajaram's and Wilson Sonsini's independence from Andreessen and Andreessen Horowitz.

Aspects of the record support Plaintiff's argument as to Rajaram.  Andreessen has been instrumental or present in most of Rajaram's major career milestones. Andreessen first invested in Rajaram's startup, Chai Labs, in 2007.  He served on its three-person advisory board after.  Rajaram testified that Chai Labs used Andreessen's name and reputation to attract talent and other investors.[126] Andreessen was on the board of Facebook when Facebook acquired Chai Labs.  The sale of Chai Labs approximately doubled Rajaram's net worth at the time.  And after

---

[124] *Baker Hughes*, 2023 WL 2967780, *18 (noting that reliance on counsel is "is not only allowed but is 'evidence [of] good faith and the overall fairness of the process." (quoting *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *23 n.67 (Del. Ch. May 22, 2000)); *In re Carvana Co. S'holders Litig.*, 2024 WL 1300199, *11 (Del. Ch. Mar. 27, 2024) (noting that the level of delegation to counsel was "in line with precedent"); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1997 WL 305829, at *12 (Del. Ch. May 30, 1997) ("[G]ood faith reliance by the SLC on independent, competent counsel to assist the SLC in investigating claims is legally acceptable, practical, and often necessary.").

[125] *See, e.g., Carlton*, 1997 WL 305829, at *12 ("Where there is no evidence of overreaching by counsel or neglect by the SLC, the court ought not second guess the SLC's decisions regarding the role which counsel played in assisting them in their task.").

[126] Rajaram Dep. Tr. at 99:4–6, 101:21–102:4.

21

the acquisition, Andreessen served on the boards of Chai Labs and Facebook, boards to which Rajaram reported.

Rajaram also has thick ties with Andreessen Horowitz, the entity that made $118.7 million off the Challenged Trades. To recap, Rajaram's venture capital firm, Firebolt, lists Andreessen and another Andreessen Horowitz executive as two of eleven "Strategic LPs For Deal Flow."[127] As described by Rajaram, large leader-type funds like Andreessen Horowitz often "solicit people, smaller funds, angels, et cetera, to fill [funding] round[s]."[128] And Firebolt invested alongside Andreessen Horowitz at least 50 times in the last six years.[129] Andreessen Horowitz was the lead investor of the funding round in all but one of Firebolt's 50 co-investments.[130] Rajaram exchanged hundreds of emails with the Andreessen Horowitz team over the course of the SLC investigation. Those emails included dozens of cross-referrals.[131] In one of the emails, the Andreessen Horowitz team described Rajaram as their "MVP."[132]

Still, aspects of the record support Rajaram's independence. In his deposition, Rajaram denied that he lacked independence. Rajaram testified that his financial dealings with Andreessen Horowitz "didn't really matter," because the investments he made alongside Andreessen Horowitz had yet to generate profit and had no impact

---

[127] Pl.'s Opp. Br., Ex. 26.

[128] Rajaram Dep. Tr. at 266:4–15.

[129] Pl.'s Opp. Br., Exs. 3–7; *see* Rajaram Dep. Tr. at 127:20–129:3.

[130] Pl.'s Opp. Br., Exs. 3–7.

[131] *See id.*, Exs. 28–31, 34, 37–39, 41–45, 47.

[132] *Id.*, Ex. 44.

on his net worth.[133]  He went further to say that: "[M]y dealings with the defendants occupy no space in mind.  It's not something that I even think about. . . . [I]t's not something that affects my life or my personal situation[.]"[134]  Rajaram stated that he would sue Defendants, without hesitation, if the SLC's investigation so required.[135]

In briefing, the SLC argued that Rajaram's relationships with Andreessen and Andreessen Horowitz are immaterial to Rajaram.[136]  According to the SLC, Rajaram is a highly successful investor with a net worth of approximately $400 million, making it "unreasonable" to suggest that cross-referrals are material to Rajaram or that he would forsake his reputation for such an "immaterial" relationship.[137]  The SLC also sought to distance Rajaram from his investments made through Firebolt.[138]  And the SLC argued that Rajaram's profits from investing alongside Andreessen Horowitz in its funding rounds should be ignored because Andreessen (the person), and not Andreessen Horowitz (the fund), was the target of the investigation.[139]

Each of the SLC's arguments misses the mark.  Just as "it would be naïve to say, as a matter of law, that $3.3 million is immaterial," it would be hard to conclude

---

[133] Rajaram Dep. Tr. at 384:9–16.

[134] *Id.* at 49:25–50:4; *see also id.*, at 49:21–25.

[135] *Id.* at 48:20–22, 385:25–386:11.

[136] SLC Opening Br. at 53–54.

[137] *Id.* at 53–54, 56.

[138] *Id.* at 52–53.

[139] *Id.* at 53.

that $2 to $4 million in investments were immaterial to Rajaram.[140] Rajaram testified that Firebolt was his primary investment vehicle during the relevant period; there is no factual basis to distance Rajaram from his entity.[141] Similarly, it was Andreessen Horowitz that made and benefited from the Challenged Trades, allegedly based on Andreessen's MNPI. The SLC provides no legal basis for ignoring that fact; logic demands that the court consider it.

In the end, the question is not whether Rajaram believes that he is independent or even whether he stated so under oath. The question is whether Rajaram's relationships with Andreessen and Andreessen Horowitz create material disputed facts giving rise to an unacceptable risk of bias in a process where independence is paramount. They do.

*Oracle* is instructive.[142] There, members of the Oracle board sold between 2% and 17% of their stock shortly before the company announced that it missed growth projections by a substantial margin. The company's stock price plummeted, and market analysts ridiculed the board for its positive outlook just weeks before. Stockholder plaintiffs asserted *Brophy* claims in this court. The defendants did not move to dismiss the action. Instead, they formed a special litigation committee to

---

[140] *Orman v. Cullman*, 794 A.2d 5, 31 (Del. Ch. 2002); *see also, e.g., In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 813 (Del. Ch. 2022) ("A greater than half-million-dollar payout is presumptively material at the motion to dismiss stage," even if "the defendants may 'ultimately be correct . . . that it was not material[.]'" (quoting *Frank v. Elgamal*, 2012 WL 1096090, at *11 (Del. Ch. Mar. 30, 2012)).

[141] Rajaram Dep. Tr. at 125:9–19 ("From 2018 to 2024, almost all my investments happened through Firebolt, not personally.").

[142] 824 A.2d 917 (Del. Ch. 2003).

investigate the claims. The committee concluded that the defendants did not possess MNPI at the time of the trades and that there was no evidence of scienter. The committee moved to terminate the litigation.

The stockholder plaintiffs challenged the independence of the two committee members, both of whom were professors at Stanford University. The committee's report disclosed that one of the *Brophy* defendants was a Stanford professor. And another *Brophy* defendant had donated $50,000 worth of stock to Stanford Law School to thank one of the committee members for delivering a speech at his son's venture capital firm.[143] *Zapata* discovery revealed the following additional relationships, which suggested the existence of thicker ties between the committee members and defendants than disclosed in the report:

- One of the *Brophy* defendants, then-CEO of Oracle Larry Ellison, was "a major figure" in the Silicon Valley "community" and in "the nation's increasingly important information technology industry."[144] While Ellison was CEO, Oracle had donated over $300,000 to Stanford and had established an education non-profit where Stanford had substantial governance authority. He had been in talks with Stanford and its Institute for Economic Policy Research to establish a $170 million scholarship program in his name; one of the committee members was asked to be involved in the initiative. Ellison had also made public statements expressing his intent to leave his $100 million home to Stanford upon his death.[145]

- Another of the *Brophy* defendants (the "Professor") taught a committee member during a critical milestone in the committee member's career— when the committee member was a Ph.D. candidate. The two maintained continued affiliations, as both were involved in the Stanford

---

[143] *Id.* at 929.

[144] *Id.* at 932.

[145] *Id.* at 932–35.

25

Institute for Economic Policy Research, which helped facilitate and publicize their research.[146]

- Yet another of the *Brophy* defendants (the "Donor") caused his charitable foundation to donate $11.7 million and had personally donated $4.1 million to Stanford, including $424,000 to the Stanford Institute for Economic Policy Research and $149,000 to Stanford Law School. He was also the chair of the Stanford Institute for Economic Policy Research's advisory board.[147]

The SLC argued that none of these relationships impugned the committee members' independence, largely because the committee members—both tenured professors—faced zero threat of any negative consequences from Stanford for deciding to pursue claims against the defendants. The court credited the factual bases for the defendants' arguments, finding that:

> I am satisfied that neither of the SLC members is compromised by a fear that support for the procession of this suit would endanger his ability to make a nice living. Both of the SLC members are distinguished in their fields and highly respected. Both have tenure, which could not have been stripped from them for making a determination that this lawsuit should proceed.
>
> Nor have the plaintiffs developed evidence that either [of the SLC members] have fundraising responsibilities at Stanford. . . . [T]he SLC members occupy positions within the Stanford community different from that of the University's President, deans, and development professionals, all of whom, it can be reasonably assumed, are required to engage heavily in the pursuit of contributions to the University.[148]

The court emphasized these conclusions elsewhere in the opinion:

---

[146] *Id.* at 931.

[147] *Id.* at 931–32.

[148] *Id.* at 930.

[N]one of the [defendants] have the practical ability to deprive [the committee members] of their current positions at Stanford. Nor, given their tenure, does Stanford itself have any practical ability to punish them for taking action adverse to [a defendant]—each of whom . . . has contributed (in one way or another) great value to Stanford as an institution. As important, neither [committee member is] part of the official fundraising apparatus at Stanford[.][149]

Although the court credited the SLC's arguments that the committee members faced no economic consequences that would impugn their independence, the court denied the motion to terminate based on concerns about the committee members' independence. In reaching this conclusion, the court criticized the defendants' arguments as inviting an overly "reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement. *Homo sapiens* is not merely *homo economicus*."[150] Delaware law, according to the court, recognizes that considerations beyond economic consequences are just as capable of influencing human behavior.[151]

---

[149] *Id.* at 935–36.

[150] *Id.* at 938.

[151] *Id.* ("Nor should our law ignore the social nature of humans. To be direct, corporate directors are generally the sort of people deeply enmeshed in social institutions. Such institutions have norms, expectations that, explicitly and implicitly, influence and channel the behavior of those who participate in their operation. Some things are 'just not done,' or only at a cost, which might not be so severe as a loss of position, but may involve a loss of standing in the institution. In being appropriately sensitive to this factor, our law also cannot assume—absent some proof of the point—that corporate directors are, as a general matter, persons of unusual social bravery, who operate heedless to the inhibitions that social norms generate for ordinary folk." (citation omitted)).

27

The court further concluded that the committee members' ties to the Professor and Donor, standing alone, were enough to defeat the SLC's independence. The court questioned the committee members' ability to impartially consider whether to "press insider trading claims against a fellow professor at their university."[152] The court was particularly skeptical of one of the committee members who had "mutual affiliations" and historical connections with the Professor.[153] The Professor was present during a critical milestone in the committee member's career and the two maintained professional affiliations. The court also questioned the committee members' willingness to press insider trading claims against the Donor, an "extremely generous and . . . influential Stanford alumnus," given their positions at Stanford.[154] The court reached these conclusions even though the committee members had no material financial ties to either the Professor or the Donor, were not dominated or controlled by the Professor or the Donor, stated their indifference to pressing claims against the Professor and the Donor,[155] and no one questioned the committee members' good faith.[156]

---

[152] *Id.* at 942; *cf. id.* at 945 ("The idea that faculty members would not be concerned that action of that kind might offend a large contributor who a university administrator or fellow faculty colleague . . . had taken the time to cultivate strikes me as implausible and as resting on a narrow-minded understanding of the way that collegiality works in institutional settings.").

[153] *Id.* at 943.

[154] *Id.*

[155] *Id.* at 930, 937.

[156] *Id.* at 947.

The committee members' relationship with the third relevant *Brophy* defendant—Ellison—"reinforce[d]" the court's conclusion.[157] But the *Oracle* court's discussion on this point warrants pause and clarification, given the obvious comparisons between Ellison and Andreessen. The *Oracle* court wrote that "[t]he notion that anyone in Palo Alto can accuse Ellison of insider trading without harboring some fear of social awkwardness seems a stretch."[158] And that is a fair statement. But it is also dicta, and more a social observation than a statement of law. Delaware law does not treat the "fear of social awkwardness" as a bias-producing quality sufficient to disqualify a special committee member.[159] Not even *Oracle* proclaims it so. As the *Oracle* court also clarified, being "the key force behind a very important social institution in Silicon Valley" does not "disqualif[y] all persons who live there from being independent of" Ellison.[160]

Still, *Oracle* offers several lessons for SLC motions to terminate. At a high level, *Oracle* appropriately warns against a reductionist view of human nature, commends a nuanced and contextualized analysis of human relationships, and emphasizes the paramount role that the independence inquiry plays in a *Zapata* analysis. It likewise demonstrates that the independence inquiry is not always as simple as searching for one "smoking gun" of financial reliance or the opposite.

---

[157] *Id.* at 945.

[158] *Id.*

[159] *Id.*

[160] *Id.*

Multiple financial and personal connections can accumulate to a significant concern about independence.

Those lessons resonate here. It is not necessarily Andreessen's status within Silicon Valley that gives rise to a material dispute concerning Rajaram's independence. It is the fact of Andreessen's influential presence during multiple milestones of Rajaram's career, including a critical wealth-building moment. It is that Rajaram has invested alongside Andreessen Horowitz approximately 50 times over the six years before the SLC investigation. It is the hundreds of emails between Rajaram and the Andreessen Horowitz team exchanged during the SLC process, including dozens of cross-referrals. It is the cumulative effect of all these things. No one—not Plaintiff and thus not the court—questions Rajaram's good faith. But the thick ties between him and the subject of the SLC's investigation are sufficient to raise material disputes regarding his independence.

For this reason, the SLC has failed to meet its burden under the first step of *Zapata*. This decision does not reach Plaintiff's arguments as to Wilson Sonsini, except to say what is undoubtedly uncontroversial—advising Andreessen Horowitz on multiple transactions while advising the SLC on its investigation into Andreessen Horowitz's sizeable trades was suboptimal.

### 2. Second Step

Because the SLC failed to carry its burden under the first step of the *Zapata* analysis, this analysis does not reach the second step.

30

## III.   CONCLUSION

*Oracle* offers one final lesson for purposes of this decision.  After the court denied the SLC's motion to terminate in *Oracle*, the remaining defendants moved for summary judgment on the *Brophy* claims, and the court granted the motion.[161] The court's reasoning largely tracked the special litigation committee's earlier report.[162] Here, the SLC Report paints a compelling narrative that favors Defendants and appears to lay a path to summary judgment if the undisputed facts are as the report suggests.  As in *Oracle*, the work of the committee and the reasoning of its report might ultimately carry the day.  But for today's purposes, the SLC has not carried its burden.

The SLC's motion to strike is granted.  The SLC's motion to terminate is denied.  IT IS SO ORDERED.

Sincerely,

*/s/ Kathaleen St. J. McCormick*

Chancellor

cc:    All counsel of record (by *File & ServeXpress*)

---

[161] *In re Oracle Corp.*, 867 A.2d 904, 906 (Del. Ch. 2004), *aff'd sub nom. In re Oracle Corp. Deriv. Litig.*, 872 A.2d 960 (Del. 2005).

[162] *Compare id.* at 906–07, 934–54, *with Oracle*, 824 A.2d 926–28.

31